**UNITED STATES of America, Appellee,**

v.

**Cecil ROBINSON, Appellant.**

**No. 1184, Docket 76–1153.**

United States Court of Appeals, Second Circuit.

Argued June 18, 1976.

Decided Nov. 1, 1976.

---

Jesse Berman, New York City, for appellant.

Elliot Sagor, Sp. Asst. U. S. Atty., New York City (Robert B. Fiske, Jr., U. S. Atty., S. D. N. Y., Lawrence B. Pedowitz, John C. Sabetta, Asst. U. S. Attys., New York City, of counsel), for appellee.

Before MANSFIELD, OAKES and GUR-FEIN, Circuit Judges.

OAKES, Circuit Judge:

This singular case involves the admissibility of testimony regarding a .38-caliber handgun found in the possession of appellant, Cecil Robinson, at the time of his arrest for bank robbery. Following the exclusion of both the gun itself and testimony

pertaining thereto at appellant's first trial, the jury hung 8–4 for conviction. With the admission of evidence pertaining to the gun at a retrial, a conviction was rendered after three days of jury deliberation and two Allen-type charges, *Allen v. United States,* 164 U.S. 492, 501–02, 17 S.Ct. 154, 41 L.Ed. 528 (1896). The conviction, for bank robbery under 18 U.S.C. § 2113(a),[1] led to the imposition of a twelve-year prison sentence by the United States District Court for the Southern District of New York, Frederick van Pelt Bryan, *Judge.*

A principal ground for appeal is that it was reversible error to admit into evidence testimony regarding the .38-caliber handgun found in appellant's possession ten weeks after a bank robbery in which several guns, including a .38, were allegedly used. After a review of the evidence, we agree with appellant that the admission of testimony regarding his possession of the gun was error. We also conclude that this error affected the judgment, and we therefore reverse and remand for a new trial.

On May 16, 1975, four men entered the 177 East Broadway branch of the Bankers Trust Company in New York and robbed it of $10,122. One robber wielded a sawed-off shotgun, and a teller received a bullet wound from a .32, not a .38, caliber revolver held by one of the other robbers. Bank surveillance films recorded rather limited images of only three of the men, the fourth robber having remained by the door and out of the camera's range. The robber with the shotgun was dressed in black. The two others both wore white coats; one of these men wore glasses, and the other a hat, stocking cap and gloves. The getaway car was a red 1974 Pontiac, which was found abandoned twenty minutes after the robbery; it had been stolen the day before from one Otis Brown.

One month after the robbery, on June 17, 1975, Allen Simon was arrested and charged with participation in the robbery as the

---

1. Appellant was also indicted for conspiracy to commit bank robbery under 18 U.S.C. § 371, and armed bank robbery under 18 U.S.C. § 2113(d), which counts were dismissed on appellant's motion without opposition from the Government after return of a guilty verdict on the bank robbery charge.

man in black armed with the sawed-off shotgun. Simon was shown surveillance photos of the robber in the white coat, hat and gloves, and mug shots of Edward Garris and Carson Corley. At first Simon denied knowing Garris or Corley and denied that the robber in the white coat and hat was appellant Robinson. Later, however, Simon identified Robinson, also named "Merciful," as this robber; identified Garris, also known as "A. E." or "Allah Equality," as the fourth man who remained at the door; and identified a man known only to him as "Karim" as the robber in the white coat and glasses who wounded the teller. Simon pleaded guilty to bank robbery and use of a firearm on August 19, 1975, receiving an eighteen-year sentence. He then agreed to testify against Robinson in return for government aid in the reduction of his sentence. Simon testified at both appellant's first trial in November, 1975, and at the trial below, in January, 1976. At the time of appellant's second trial, Simon had a Rule 35 application for the reduction of his sentence pending, which subsequently was granted in the form of a reduction of his sentence to twelve years. Throughout, Simon maintained the innocence of Corley, who had been arrested but was released upon the failure of Simon to inculpate him.[2] Garris was indicted on the basis of Simon's evidence, but neither he nor "Karim" has yet been apprehended.

Appellant was arrested on July 25, 1975, ten weeks after the robbery, at the Gouverneur Hospital, where he worked part-time in a work-study program as a student in medical lab technology at Bronx Community College. In his possession on arrest were $6.30 and a .38 revolver in a vinyl case with two bullets.

The Government's case at both trials[3] rested primarily, if not almost solely, on the testimony of Simon. None of the eight bank employees called as witnesses to the robbery identified Robinson as a participant. Bank surveillance photographs showed a man scooping money into a bag, but the photographs are far from clear. Indeed, with due respect to the dissenting opinion, comparison of appellant Robinson's photograph with those taken in the bank provokes appellate uncertainty as much as it provoked uncertainty in two juries; moreover, there is nothing in the surveillance photos to show that the man who purportedly is Robinson was using a gun at the time of the robbery. Only Simon identified the man in the photographs as Robinson, which of course adds nothing to Simon's verbal account of the robbery.

It was stipulated that Robinson's fingerprints appeared on the right rear cigarette lighter panel of Otis Brown's car; Brown testified, however, that prior to May 16, 1975, appellant had been in the same trainee-work-study program with him at Bronx Community College, and that he had given Robinson rides in his car a half-dozen times in April and May, prior to the robbery, on several of which occasions Robinson had ridden in the back seat. There was no testimony that Robinson obtained the getaway car for the robbers; the dissent's reference to "evidence" that Robinson "offered" to obtain such a car is to nothing more than the uncorroborated testimony of the alleged accomplice, Simon. The Government's fingerprint expert testified that there was no scientific means to determine how long Robinson's fingerprint had been in the car, and that it was possible it had been there two months or longer prior to the date of the robbery. In addition to this ambiguous

---

2. It was stipulated at trial that one of the customers who witnessed the robbery but did not testify selected Carson Corley from a photo spread as "very closely resembling" one of the robbers in the white coats. The bank manager specifically identified Corley as resembling the robber in the white coat and glasses who shot the teller, as did Corley's Federal parole officer. Two other bank employees who testified for the Government also had identified Corley

from a photo spread as one of the robbers. None of these witnesses, however, was ever shown a photo of appellant Robinson, and none could identify him as a participant in the robbery.

3. The government does not suggest that there was any relevant substantive variance between the proof submitted at the first trial and that introduced in the trial below.

evidence (it did show that Robinson had ridden in the car that was stolen for use in the bank robbery), there was testimony by two Human Resources Administration employees that appellant knew Garris, the accused fourth robber. Personnel records from Gouverneur Hospital also showed that appellant was not present at work as scheduled on May 16, 1975; the hospital is located two blocks from the Bankers Trust Company bank.

At appellant's first trial, the Government sought to have the evidence of appellant's possession of the .38 handgun admitted as probative of Robinson's opportunity or preparation to commit the crime charged under *United States v. Ravich,* 421 F.2d 1196 (2d Cir.), *cert. denied,* 400 U.S. 834, 91 S.Ct. 69, 27 L.Ed.2d 66 (1970). Judge Duffy excluded the evidence concerning the gun. The jury deliberated for three days, as stated hung 8–4 for conviction, and a mistrial was declared.

At the second trial, which began on January 21, 1976, the Government again sought admission of the weapon while appellant argued strenuously against a reversal of Judge Duffy's prior ruling on the same facts.[4] It was not until all the evidence was in (except the testimony as to appellant's knowing Garris), and after several hearings on the question, that Judge Bryan admitted the testimony of the detective who arrested Robinson regarding the latter's possession of the .38; the judge did not permit the gun itself to be produced. Appellant took exception to the court's instructions limiting consideration of the gun to the issue of appellant's identity as one of the robbers.[5] The jury deliberated for a day and a half, after which it reported itself deadlocked 11 to 1, and received an Allen-type charge. It continued deliberation for three more hours until a note from one juror, which the court sealed and did not reveal to counsel, sought advice on the ground of her "strong reasonable doubt." This note the court answered with another Allen-type charge. On the afternoon of the third day of deliberations, the jury rendered its guilty verdict.

Appellant's principal contention is that Judge Bryan erred in admitting the testimony concerning appellant's possession of the .38-caliber gun at the time of his arrest ten weeks after the robbery. We first note that the relevance of the testimony is uncontested. Under Federal Rule of Evidence 401, evidence, to be relevant, need only have "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *See also United States v. Ravich, supra,* 421 F.2d at 1203–04.

The more complex or subtle problem we face is balancing the probative value of the gun evidence against its prejudicial effect. Federal Rule of Evidence 403 provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

---

4. Appellant's counsel also promised to make no argument in his summation to the effect that appellant had no access to guns and therefore could not have committed the robbery.

5. Judge Bryan's charge on the evidentiary value of the gun was as follows:

  In certain instances evidence may be admitted for a particular, limited purpose only. Now, you have heard testimony about a .38 calibre hand gun which was found when the defendant was arrested on these charges, some two months after the robbery. That testimony was admitted for a very limited purpose. It may be considered only for whatever value, if any, it has on the issue of defendant's identity as one of the robbers, that is, on the question of whether this defendant was the person who committed the crimes charged. You may not draw any conclusions or inferences or engage in any speculation as to the defendant's character or reputation on the basis of this testimony or about anything else other than the narrow thing that I have just mentioned to you. You may consider this evidence solely for the limited purpose I have described and give it such weight, if any, for that purpose as you think it may deserve.

This rule essentially restates the rule of at least thirty jurisdictions. *See* Dolan, *Rule 403: The Prejudice Rule in Evidence,* 49 So.Cal.L.Rev. 220, 224 (1976). It is designed principally to promote the twin policies of assuring "correct" factual determinations in individual cases and actual and perceived fairness in the judicial process as a whole. *Id.* at 226–30.

The phrasing of Rule 403 comports also with the traditional understanding, recognized by this court, that the weighing of probative value and prejudicial effect is a matter generally left within the wide, and wise, discretion of the trial court. *United States v. Harvey,* 526 F.2d 529, 536 (2d Cir. 1975), *cert. denied,* 424 U.S. 956, 96 S.Ct. 1432, 47 L.Ed.2d 362 (1976); *United States v. Ravich, supra,* 421 F.2d at 1204–05. Here, however, we hold that the admission of the evidence constituted serious and reversible error. The testimony regarding the .38 established only a very weak inference at best that appellant was one of the bank robbers; it was likely to have had a significant prejudicial impact on the minds of the jurors; and, in the circumstances of this exceedingly close case, may be treated as sufficiently affecting the verdict that its admission requires reversal.[6]

### PROBATIVE VALUE

To make the identification of appellant as one robber from his later possession of a .38, the jury would have had to draw two quite weak inferences, with the second being dependent on the first and with neither having much basis in the evidence presented at trial. While this court has "reject[ed] as untenable the often urged claim that an inference may not be grounded on an inference," *United States v. Ravich, supra,* 421 F.2d at 1204 n.10, it has at the same time recognized that

> [t]he length of the chain of inferences necessary to connect the evidence with the ultimate fact to be proved necessarily lessens the probative value of the evidence, and may therefore render it more susceptible to exclusion as . . . prejudicial . . . .

*Id.*

The first inference necessary to establish appellant's identity involved his possession of the .38 at the time of the robbery.[7] As Wigmore makes clear, "this inference is always open to doubt," because, for example, appellant might very well have acquired the .38 in the period since the robbery. 2 J. Wigmore, *Evidence* § 410, at 384 (3d ed. 1940). *See also id.* § 437, at 413 ("the disturbing contingency is that some circumstance operating in the interval may have been the source of the subsequent existence"). In *Ravich, supra,* however, this court found that defendant's post-robbery possession of six .38 pistols and a box of .38 ammunition was sufficient to allow an in-

---

6. The essential point reiterated by the dissent is that the trial court had discretion to admit or exclude the evidence. While we of course agree with this statement as a general proposition, it is equally plain that this discretion is far from unlimited and that appellate courts have a vital role to play in overseeing the exercise of this discretion. *Cf. Michelson v. United States,* 335 U.S. 469, 480, 69 S.Ct. 213, 220, 93 L.Ed. 168 (1948) ("[w]ide discretion is accompanied by heavy responsibility on trial courts"). Appellate review is particularly important when the case is, in other respects, a close one, as this one was, since then greater care must be exercised to ensure a rational verdict. *See* Dolan, *supra,* 49 So.Cal.L.Rev. at 255 n.133. Moreover, with all due respect to Judge Weinstein, whose treatise statement that evidence be given "its maximum reasonable probative value and its minimum reasonable prejudicial value." is quoted approvingly by the dissent,

*see also Taylor v. Northern States Power Co.,* 192 Minn. 415, 256 N.W. 674 (1934) (civil case), it can be argued with equal cogency, and in a criminal case with greater urgency, that, in the interests of "more humane and rational trials," courts should "resolve all doubts concerning the balance between probative value and prejudice in favor of prejudice." Dolan, *supra,* 49 So.Cal.L.Rev. at 233.

7. More specific inferences, of course, are possible, such as that appellant did not possess a .38 before the robbery but simply kept a gun used at the robbery until he was arrested. It is the most general possible inference, therefore, that of access or opportunity to use a .38 two months later, which the Government relied on to prove Robinson's possession of a .38 at the time of the robbery and hence his participation in that robbery.

ference to be drawn that at least some of the guns had been possessed for a "substantial period of time" on and before the date of the robbery. 421 F.2d at 1204. For the legitimacy of such an inference, Judge Friendly relied on *United States v. Consolidated Laundries Corp.,* 291 F.2d 563 (2d Cir. 1961), which stated the principle that "the subsequent existence of a fact supports the inference of its earlier existence, when the subsequent condition is one which ordinarily would not exist unless it had also existed at the earlier time." *Id.* at 569, *citing* 2 Wigmore, *supra,* § 437, at 413–14. In *Consolidated Laundries,* this principle supported the inference that a file of documents evidently procured by the Government from its key witness before trial and found in the Government's possession after trial could properly be found to have been in its possession during trial. Whatever the applicability of this principle to possession of the quantity of guns in the *Ravich* case, the inference of prior possession stands upon a significantly weaker footing here where the possession of a single gun is unaccompanied by any additionally suggestive circumstances as existed in *Ravich,* where there were large unexplained amounts of cash, positive eyewitness identification by five witnesses, and other evidence, said by the court to be "overwhelming," 421 F.2d at 1204, linking the possessor of the guns to the crime. The strength of the inference from subsequent possession to prior possession can be judged only in the context of the facts of each case. *See* 2 Wigmore, *supra,* § 437, at 414.

Once the jury had found that appellant possessed a .38 at the time of the robbery and that a .38 was actually used in the robbery,[8] it would then have had to find that appellant's undistinctive .38 was the .38 used in the robbery. Such an inference was at best highly problematic on the facts of this case. There was no evidence to link the two guns. . The single .38 found in appellant's possession was apparently a type of handgun far more common in the city of New York than, *e.g.,* a sawed-off shotgun, *United States v. Jackson,* 166 U.S. App.D.C. 166, 509 F.2d 499, 508 n.73 (1974), or a number of handguns found together with a large amount of ammunition, as in *Ravich, supra.*[9] No circumstantial evidence linked appellant to the robbery, other than Simon's testimony, the ambiguous fingerprint in Otis Brown's car, and appellant's absence from work at a hospital two blocks from the bank robbed on the date of the robbery. This case thus contrasts sharply with *Ravich, supra,* in which a wealth of direct and circumstantial evidence, independent of defendants' possession of guns, existed to link defendants to the crime. Nor was Robinson in possession of inherently suspicious burglary or robbery gear, such as masks or quantities of weapons and burglary tools, as in *United States v. Eatherton,* 519 F.2d 603, 611–12 (1st Cir.), *cert. denied,* 423 U.S. 987, 96 S.Ct. 396, 46 L.Ed.2d 304 (1975); *United States v. Roberts,* 481 F.2d 892, 894 (5th Cir. 1973); *Banning v. United States,* 130 F.2d 330, 335 (6th Cir. 1942), *cert. denied,* 317 U.S. 695, 63 S.Ct. 434, 87

**8.** There was no direct testimony on this latter point. Simon, the confessed co-robber who testified for the Government, mentioned a .38 only once, when testifying as to what guns the robbers had in an apartment on the night before the robbery. Of the three guns, one was his own .32, another was a .38, and a third "looked like it might have been a .38," but he was "not sure" of the make. While he later testified that handguns were used in the robbery, he did not mention the .38 in this context. None of the eight witnesses who testified as to their observations of the robbery identified any guns other than the shotgun wielded by Simon. In view of Simon's testimony, however, the jury could readily have concluded that a .38 was used in the robbery.

**9.** It is true that in *United States v. Ravich,* 421 F.2d 1196 (2d Cir.), *cert. denied,* 400 U.S. 834, 91 S.Ct. 69, 27 L.Ed.2d 66 (1970), three of the six .38's in the defendant's possession, which were all admitted into evidence, could not in fact have been used in the robbery. They were, however, in their particular quantity an integral part of the evidence of possession of a large number of weapons and of large sums of money. The probative value of the guns in *Ravich* thus did not depend so heavily on direct connection with the robbery itself, as must Robinson's single, otherwise unconnected .38 so depend in this case.

L.Ed. 556 (1943); large sums of money, *United States v. Fisher,* 455 F.2d 1101, 1103–04 (2d Cir. 1972); *Yates v. United States,* 362 F.2d 578, 579 (10th Cir. 1966); or bait money from the robbed bank, *United States v. Walters,* 477 F.2d 386, 388 (9th Cir. 1973), *cert. denied,* 414 U.S. 1007, 94 S.Ct. 368, 38 L.Ed.2d 245 (1974). There was here no specific evidence with a circumstantial connection to the crime, as in *United States v. Burke,* 506 F.2d 1165, 1170 (9th Cir. 1974) (gun at issue found with gun linked to robbery by witnesses), *cert. denied,* 421 U.S. 915, 95 S.Ct. 1576, 43 L.Ed.2d 781 (1975); *United States v. Thornton,* 149 U.S.App.D.C. 203, 462 F.2d 307, 309 (1972) (defendant seen with red sweater shortly after theft; police found red sweater next to property of victim near scene of defendant's arrest); *United States v. Montalvo,* 271 F.2d 922, 925, 927 (2d Cir. 1959) (blade of knife caked with heroin in narcotics case), *cert. denied,* 361 U.S. 961, 80 S.Ct. 589, 4 L.Ed.2d 543 (1960). Of further significance is the fact that the use of any .38, much less the one here involved, was not testified to by any witness to the robbery, including appellant's coconspirator Simon, in contrast to the identification by other witnesses in *United States v. Jackson, supra,* 509 F.2d at 501–02 (victim identified assailant and sawed-off shotgun similar to one used in robbery); *Pinkney v. United States,* 124 U.S.App.D.C. 209, 363 F.2d 696, 698 (1966) (eyewitness identified defendant's knife as similar to one used in homicide and described it before seeing it); *Yates v. United States, supra,* 362 F.2d at 579 (six eyewitnesses identified black and white .38 as used in robbery); *Jones v. United States,* 262 F.2d 44, 47 (4th Cir. 1958) ("deep-sixed" gun barrel exactly fitted sawed-off shotgun identified by two victim eyewitnesses), *cert. denied,* 359 U.S. 972, 79 S.Ct. 887, 3 L.Ed.2d 839 (1959).[10]

## PREJUDICIAL EFFECT

Thus, the probative value of the testimony that appellant possessed a .38 ten weeks after the robbery must be characterized as slight. But, under Rule 403, a finding of slight probative value is insufficient to warrant exclusion in and of itself. Prejudice from admission must "substantially outweigh" that value.

■ Rule 403 proscribes only "unfair prejudice," a term defined by the Advisory Committee as involving "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Advisory Committee's Note to Fed.R.Evid. 403. One "improper basis" of decision that the courts have consistently disallowed concerns attempts to obtain convictions based on the character, personal traits, or generalized bad acts of the defendant, the so-called "bad man conviction." As Wigmore put it:

> The deep tendency of human nature to punish, not because our [defendant] is guilty this time, but because he is a bad man and may as well be condemned now that he is caught, is a tendency which cannot fail to operate with any jury, in or out of Court.

1 J. Wigmore, *supra,* § 57, at 456. It is clear that Federal Rule 403 was intended to apply to this type of prejudice. *See* Dolan, *supra,* at 238–39.

■ When a person is found with a gun in his possession in an urban area such as New York City, many persons might conclude that the gun was being carried in order to commit violent crimes. When, as in this case, the person found with a gun is then singled out by the police and prosecutors, by virtue of his prosecution, as one who is likely to use a gun for an unlawful purpose, a far larger number would conclude that the possessor of the gun is a dangerous person who ought to be segre-

10. Some courts have allowed weapons to be admitted on the ground that the weapons were "similar" to ones used in the robbery without very much elaboration as to the specific degree of similarity or as to the nature of the other evidence against the defendant. *See, e.g., United States v. McKinley,* 158 U.S.App.D.C. 280, 485 F.2d 1059, 1060 (1973) (sawed-off shotgun resembled that used in crime); *United States v. Cunningham,* 423 F.2d 1269, 1276 (4th Cir. 1970) ("ample testimony" of "similarity" of weapons). To the extent that these cases may be inconsistent with our analysis, we do not follow them.

gated from society.[11] Judge Bryan's limiting instruction, note 5 *supra,* was far too cryptic to dispel the possibility of severely unfair prejudice here.[12] In view of the gun evidence's marginal probative value, we conclude that its admission constituted error.

## REVERSIBLE ERROR

In assessing whether the error of the admission of evidence concerning the gun was reversible, the crucial question, we are reminded, "is not whether there is substantial evidence to support the judgment, but whether error affected the judgment." R. Traynor, *The Riddle of Harmless Error* 28 (1970). This case is quite different from the situation in *United States v. Knight,* 166 U.S.App.D.C. 21, 509 F.2d 354, 358 (1974), where the court concluded, without resolving the question of error, that the overwhelming independent evidence of the defendant's guilt, including other real and testimonial evidence that the robbers were armed, foreclosed any danger that the introduction of ammunition and another weapon found with the robbery weapon could constitute reversible error. Rather, this case resembles *Walker v. United States,* 490 F.2d 683 (8th Cir. 1974), where the admission into evidence of the defendant's possession of a gun unrelated to the robbery was held to be reversible error. The court in *Walker* noted that the prosecution produced "less than an airtight case," and that eyewitness identification from "several" witnesses was contradicted by the inability of other witnesses to the robbery to identify the defendant, who was partially disguised. Taking these circumstances into account, as well as the "preoccupation" of one juror with the weapon evidence as indicated by his note to the court on the subject, the *Walker* court concluded that the introduction of the gun was reversible error. In appellant's case, we similarly take into account the "less than airtight" case, particularly the fact that none of the eight nonparticipant witnesses could identify ap-

---

11. In view of the comprehensive and well-publicized regulation of firearms in the state and city of New York, regulation that includes criminal penalties, N.Y. Penal Law §§ 265.01, 265.20, 400.00 (McKinney 1967 & Supp. 1975) (known as the Sullivan Law); Administrative Code of the City of New York §§ 436–5.0 to 436–6.16 (1971 & Supp. 1975), many New Yorkers might further conclude that a person arrested with a gun violated a law simply by being in possession of the gun.

12. The dissenting opinion relies heavily upon Judge Bryan's limiting instruction as dissipating likely prejudice from admission of the gun evidence. There are several problems with this reliance. First, even if the instruction were in all respects perfect, the best instruction may nevertheless be insufficient: " 'The naive assumption that prejudicial effects can be overcome by instructions to the jury . . . all practicing lawyers know to be unmitigated fiction. . . .' " *Bruton v. United States,* 391 U.S. 123, 129, 88 S.Ct. 1620, 1624, 20 L.Ed.2d 476 (1968), *quoting Krulewitch v. United States,* 336 U.S. 440, 453, 69 S.Ct. 716, 93 L.Ed. 790 (1949) (Jackson, *J.,* concurring). Second, a limiting instruction is particularly likely to be ineffective when the evidence that is being limited is itself of a prejudicial nature:

One need not take a definitive stand on the question of the general effectiveness of cautionary instructions in order to denigrate the effectiveness of cautionary instructions in the prejudice rule situation. . . .

Although many courts have realized that cautionary instructions do not always cure prejudicial effects, a substantial number of courts have clung to cautionary instructions as talismans for the solution of any possible prejudice problem. In so doing, these courts are effecting a repeal of the prejudice rule, which by its terms concedes the possibility that the negative aspects of some evidence may simply be unmanageable for the factfinder regardless of instructions. If the efficacy of cautionary instructions is accepted in all cases, then the need for the prejudice rule is obviated.

Dolan, *supra,* 49 So.Cal.L.Rev. at 248–50 (footnotes omitted).

Finally, the instruction here was, with all respect to the trial judge, insufficient to dissipate prejudice. It described the proper, limited purpose for which the evidence could be used only once and then described the improper, forbidden use of the evidence as proof of character. The jury was then told to give the evidence "such weight, if any, for that [limited] purpose as you think it may deserve." *See* note 5 *supra.* If the jury were at all confused about which use of the evidence was the proper one, a confusion which could well have occurred, the concluding statement would have led the jury to give the evidence the weight "it may deserve" for any and all purposes.

pellant, the three days of jury deliberations and two *Allen*-type charges required to produce a verdict of guilty, and the fact that a jury had previously hung in the absence of admission of the gun. While, to be sure, in *Walker* the court noted that "similar" weapons "not positively identified" are "regularly" admitted into evidence, 490 F.2d at 684 (dictum), as we believe we have demonstrated above, the delicate balancing of factual relevance and potential prejudicial effect in a given case is not susceptible to so simplistic an analysis as the *Walker* dictum suggests. We must conclude that the admission of the gun here so affected the judgment as to constitute reversible error.

## SEALING OF JUROR'S NOTE

Appellant raises one other point on appeal which requires comment. After two days of deliberations, a note from the jury revealed an 11–1 deadlock for conviction; the court revealed the deadlock, although not the 11–1 figure, to counsel and gave an *Allen*-type charge. Several hours later one juror sent another note to the court which read: "Your Honor, regardless of honest efforts of my co-jurors to persuade me, I am unable to reach a decision without a strong reasonable doubt. Can you advise me what to do?" The court sealed the note, without revealing its contents to counsel.[13] When told by the court the next day that the note concerned one juror's state of mind, appellant's counsel replied that he could not comment intelligently as to how to answer the note without knowing the note's contents. The court did not reveal the contents to counsel, but instead answered the note by giving the whole jury another *Allen*-type charge.[14]

13. The Government contends that appellant's failure to object to the sealing of the note precludes his claim of error on this ground. But defense counsel need not be expected to object to every sealing of a note by the court on the presumption that every such sealing may be error. Because of ignorance of the note's contents, appellant's counsel did not possess the information that could have prompted an informed initial objection to the sealing. Counsel did sufficiently object to the court's solution of giving the second *Allen*-type charge.

14. In view of our disposition of this case, we need not consider the propriety of the trial judge's giving two *Allen*-type charges after having been informed initially of the jury's 11–1 division, with the second charge coming after the sole minority juror had written to the judge about her "strong reasonable doubt." While this court has in the past upheld the giving of an *Allen* charge after the trial judge had received an unsolicited note from the jury stating its division, *United States v. Lee,* 509 F.2d 645, 646 (2d Cir.) (per curiam), *cert. denied,* 422 U.S. 1044, 95 S.Ct. 2645, 45 L.Ed.2d 696 (1975); *United States v. Jennings,* 471 F.2d 1310, 1314 (2d Cir.), *cert. denied,* 411 U.S. 935, 93 S.Ct. 1909, 36 L.Ed.2d 395 (1973); *United States v. Meyers,* 410 F.2d 693, 697 (2d Cir.), *cert. denied,* 396 U.S. 835, 90 S.Ct. 93, 24 L.Ed.2d 86 (1969), a case involving two *Allen* charges, following the judge's awareness of a "lone holdout" situation like the present one, has apparently not arisen.

The potentially coercive impact of an *Allen* charge after advice to the judge that a small minority of the jury favors acquittal has been recognized by judges and commentators alike. Chief Justice Burger, as Circuit Judge, upheld the declaring of a mistrial after the jury foreman had revealed the status of the vote:

It would have been a precarious undertaking for the Judge to give a supplemental charge to consider each other's views when he was already advised that only 4 of 12 jurors voted for acquittal.

*Mullin v. United States,* 123 U.S.App.D.C. 29, 356 F.2d 368, 370 (1966). As Judge Sobeloff of the Fourth Circuit elucidated:

What is it, then, that makes it a "precarious undertaking" for a judge to give an *Allen*-type charge after he has been made aware how the vote stands? . . . When the judge does not know how the jurors have voted, and a properly balanced *Allen* charge is delivered, the jurors may readily accept it as addressed to the entire panel.

However, when the jurors know that the judge has been advised precisely how they are divided . . . the effect of an *Allen* charge is unavoidably to add the judge's influence to the side of the majority . . . . In this predicament minority jurors are likely to develop a sense of isolation and the impression that they are the special object of the judge's attention.

*United States v. Sawyers,* 423 F.2d 1335, 1349 (4th Cir. 1970) (dissenting opinion). *See also United States v. Meyers, supra,* 410 F.2d at 697 (dissenting opinion); Note, *The Allen Charge: Recurring Problems and Recent Developments,* 47 N.Y.U.L.Rev. 296, 306–08 (1972); Note, *Due Process, Judicial Economy and the Hung Jury: A Reexamination of the Allen Charge,* 53 Va.L. Rev. 123, 130–32 (1967).

In view of our decision that admission of the gun evidence constituted reversible error, we need not decide whether the court below erred in not revealing the contents of the note more specifically to counsel. The better practice, however, would have been to reveal the note, without revealing the individual juror's name or the jury vote. *See United States v. Dellinger,* 472 F.2d 340, 377–80 (7th Cir. 1972), *cert. denied,* 410 U.S. 970, 93 S.Ct. 1443, 35 L.Ed.2d 706 (1973). In the instant case this could have been done by simply excising the phrase "regardless of honest efforts of my co-jurors to persuade me," which may have carried the implication that eleven of the notewriter's co-jurors were involved. Appellant's counsel could then have moved for a mistrial because of a hung jury, or have proposed an instruction on reasonable doubt as an alternative to an *Allen*-type charge. The Government argues that any requests or suggestions the appellant's counsel might have made could all have been and were anticipated by the court, and were certainly within its power to deny. That this might be so is irrelevant to the right of the appellant to be informed of the contents of the note, and also ignores the benefits which informed discussion and debate between court and counsel may produce even where a court may be aware in the abstract of its own alternatives.[15]

Judgment reversed and remanded.

The giving of two charges after the judge knows there is only one dissenter on the jury seems substantially more coercive. The second charge must inevitably heighten the dissenter's impression that the court is speaking specifically to him or her when it admonishes the jurors "that they should listen, with a disposition to be convinced, to each other's arguments." *Allen v. United States,* 164 U.S. 492, 501, 17 S.Ct. 154, 157, 41 L.Ed. 528 (1896).

15. Because we remand for a new trial it is unnecessary to address ourselves to the *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), issue raised by appellant and the alleged exploitation thereof in the Government's summation. We find no merit to the allegations that the arrest warrant for "Cecil Robinson, a/k/a 'Merciful'" (pursuant to which arrest the gun was seized) was a general

MANSFIELD, Circuit Judge (dissenting):

I must respectfully dissent for the reason that in my view Judge Bryan did not abuse his discretion in admitting proof that when Robinson was arrested he had on his person a .38 caliber hand gun, the same caliber as the gun which was shown by other proof to have been possessed by Robinson when he participated in the bank robbery. As the majority concedes, this evidence was clearly relevant. In my view it represented strong corroboratory proof of Robinson's participation in the robbery, clearly outweighing any prejudice.

The significance of Robinson's post-arrest possession of a .38 caliber revolver becomes apparent when one examines the other evidence in the case, which reveals both his participation in the bank robbery and his use of a .38 caliber revolver during the robbery. His participation was shown by the direct testimony of his co-participant Simon, by bank photos showing Robinson scooping money into a paper bag during the robbery,[1] and by evidence that on the day before the robbery Robinson had offered to obtain a get-away car. The stolen get-away car used in the robbery, and later found abandoned, was a 1974 Pontiac owned by a friend of Robinson named Otis Brown. In addition, the evidence showed that on the day of the robbery Robinson failed to show up for work as a laboratory technician at the Gouverneur Hospital, two

warrant or based on insufficient probable cause.

1. On the basis of my own close examination of the photographs introduced into evidence, including comparison of conceded photos of Robinson (GX 17) with some of those taken by the bank surveillance camera of one of the persons engaged in the robbery (GX 106A–109A), I am persuaded (as apparently was the jury) by the similarity in facial features, including the shape and contours of the mouth, chin, nose, eyebrows, forehead, mustache, and hairline, that they depict one and the same person, as Simon testified at trial. In addition, of course, the jury was able at trial to see Robinson in person for comparison with the bank photos, which we have not done.

blocks away from the bank which was robbed, that in order to allay any suspicions on the part of bank employees the robbers wore white jackets of the type worn by employees of that hospital who frequented the bank, and that after the robbery Robinson's fingerprint was found in the abandoned get-away car.

There also was ample proof that Robinson used a .38 caliber revolver during the bank robbery. Simon testified that on the night before the robbery the four participants (Simon, Robinson, "Karim," and Garris) assembled four guns to be used in the carrying out of the crime: one shotgun, one .32 caliber hand gun, one .38 caliber revolver, and one revolver "that looked like it might have been a .38." During the course of the robbery Simon used the shotgun, Karim used the .32 caliber revolver, which he accidentally discharged during the robbery (wounding a teller), and Garris held a gun on a teller, while Robinson emptied the cash drawers. Immediately after the robbery Simon testified that Robinson handed over his gun to Garris in the back seat of the get-away car. From this evidence it was logical for the jury to infer that during the robbery Robinson had in his possession a .38 caliber hand gun.

In light of the independent evidence of Robinson's participation in the robbery and possession of a .38 caliber hand gun, his possession of a .38 caliber hand gun on the day of his arrest has considerable probative significance. In determining the probative value to be attached to this type of circumstantial evidence we are, of course, always dealing with probabilities. While hand guns may be all too plentiful in our society, the majority would imply that they are as common as subway tokens. In fact, the vast majority of people do not possess a hand gun, much less one of .38 caliber. To find such a gun in the possession of the very person against whom there is independent proof that he used a .38 caliber hand gun in the bank robbery is sufficiently coincidental to be extraordinary. I cannot agree with the majority that this evidence "established only a very weak inference that appellant was one of the bank robbers." On the contrary, while there is always the outside possibility that the gun might have been acquired by him after the robbery, the strong probability is that, absent any evidence that it came from some intervening source, the gun had been in his possession and used by him in the bank robbery. In *United States v. Ravich,* 421 F.2d 1196, 1204 (2d Cir. 1970), which the majority tries mightily but in my view without success to distinguish, Judge Friendly stated the guiding principle:

"Nevertheless, a jury could infer from the possession of a large number of guns at the date of arrest that at least some of them had been possessed for a substantial period of time, and therefore that the defendants had possessed guns on and before the date of the robbery. See *United States v. Consolidated Laundries Corp.,* 291 F.2d 563, 569 (2 Cir. 1961), and 2 Wigmore, Evidence § 437(1) (3d ed. 1940). Direct evidence of such possession would have been relevant to establish opportunity or preparation to commit the crime charged, and thus would have tended to prove the identity of the robbers, the only real issue in this trial. See *Morton v. United States,* 87 U.S.App.D.C. 135, 183 F.2d 844 (1950); *United States v. Montalvo,* 271 F.2d 922, 927 (2 Cir. 1959), cert. denied, 361 U.S. 961, 80 S.Ct. 589, 4 L.Ed.2d 543 (1960). Circumstantial evidence of such possession was therefore also relevant." [Footnote omitted].

Since Robinson's post-robbery possession of a .38 caliber hand gun corroborated the independent evidence of his possession of such a gun during the robbery itself, the experienced trial judge acted well within his discretion in concluding that its probative value outweighed any improper prejudicial effect. As the majority must recognize, the balance of probative value versus prejudicial effect is a matter best left to the wide discretion of the trial judge who, because he personally views the witnesses and the jury, is in a much better position to judge the effect of testimony as it unrolls than we are, relying only on a cold, printed

record.[2] *United States v. Leonard,* 524 F.2d 1076, 1092 (2d Cir. 1975). In *United States v. Ravich, supra,* the possible prejudice from introduction of the guns into evidence, which had "the undoubted effect on the jury of seeing all this hardware on the table," 421 F.2d at 1204–05, was far greater than in the present case, where none of the guns was introduced. Yet Judge Friendly, noting that the trial judge's "determination will rarely be disturbed on appeal" found no abuse there.

Similarly I would find no abuse of discretion on the part of Judge Bryan in the present case. It denigrates the common sense of the average jury to suggest that simply because of a defendant's later possession of a hand gun a jury would find him guilty of an earlier bank robbery. A jury is quite capable of distinguishing between the crime of bank robbery and that of possible violation of New York's Sullivan Law. When that jury is then clearly, effectively, and repeatedly instructed by the trial judge [3] that the evidence of his later possession of the gun is admitted "for a very limited purpose . . . , the issue of defendant's identity as one of the robbers," and told by the court that it may not on the basis of this evidence "draw any conclusions or inferences or engage in any speculations as to the defendant's character or reputation," the jury is not going to convict the defendant of robbery merely because he may have possessed a hand gun ten weeks after the robbery was committed. Jurors hardly expect evidence in a bank robbery case to be limited to the discreet and delicate niceties that might characterize a highly technical civil suit.

Undoubtedly the able trial judge carefully weighed these and other factors in his mind before admitting the evidence. Indeed, the conscientious exercise of his discretion is confirmed by the fact that he waited until all of the independent evidence of Robinson's participation in the robbery had been introduced (including the photographs showing Robinson engaged in the act) before permitting proof of his later possession of the gun. Judge Bryan's decision was well within his discretion.

*Walker v. United States,* 490 F.2d 683 (8th Cir. 1974), so heavily relied upon by the majority, is not only distinguishable but, if anything, supports the introduction of Robinson's later possession of the .38 caliber gun. There the admission of the defendant's later possession of a revolver was held error because it was "demonstrably unconnected with the crime," 490 F.2d 683, since the bank manager and teller, witnesses called by the government, testified that the pistol "was definitely not the weapon used in the robbery" and they "detailed the difference between the chrome-plated revolver found on Walker and the one used in the robbery which he said 'had a flat black or bluing on it like a Rossi or imported Italian.'" Said the court:

"This is not at all the classic case of admitting into evidence a 'similar' weapon which was found in the possession of a defendant but which could not be positively identified as that used in a crime. Such evidence has been regularly admitted as relevant. *E. g., Banning v. United States,* 130 F.2d 330, 335 (6th Cir. 1942); *United States v. Cunningham,* 423 F.2d 1269, 1276 (4th Cir. 1970). Here there was positive evidence that the pistol admitted was *not* similar to the one used in the crime. Thus the traditional justifica-

---

**2.** Under Federal Rule of Evidence, 403, exclusion of relevant evidence is a matter for the discretion of the trial judge. In the exercise of this discretion, Judge Weinstein has suggested that, "Judges may differ in their assessment of probative value because, like jurors, they may disagree with respect to the evidential hypothesis and, consequently, its significance to the case. Generally, the better approach on the question of admissibility is to view both probative force and prejudice most favorably to-

wards the proponent, that is to say, to give the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value." Weinstein's Evidence ¶ 403[03] (1975).

**3.** The Advisory Committee's Note to Rule 403 states that, "in reaching a decision whether to exclude on the grounds of unfair prejudice, consideration should be given to the probable effectiveness or lack of effectiveness of a limiting instruction."

**624**

tion for the admission of such a weapon is cut away and the evidence must be seen as irrelevant since it was not probative of the proposition that the accused committed the crime charged." (490 F.2d at 684)

In contrast to the revolver introduced in *Walker,* the revolver carried by Robinson upon arrest was not only "similar" to that used in the robbery—it was of the same caliber. Accordingly it was entitled to substantial probative value.

Since the majority does not reach the issue of whether the trial judge's non-disclosure of the juror's note, followed by his giving of a second *Allen*-type charge, amounted to reversible error, only a brief discussion becomes necessary. The action taken by the trial judge under the circumstances was neither improper nor an abuse of his discretion. As the majority suggests, disclosure to counsel of the juror's name and how the jury stood would have been inappropriate, possibly leading to undue pressure upon the lone dissenting juror. Disclosure of the balance of the note would hardly have afforded Robinson any tactical or other advantage. He already had enough information to ask for a repetition of parts of the judge's charge, e.g., the instruction on reasonable doubt, but he chose not to do so and not to ask for the unsealing of the note. The extremely short *Allen* charge was so mild as to border on the innocuous and was clearly permissible under the well-settled law of this Circuit. See, e.g., *United States v. Lee,* 509 F.2d 645, 646 (2d Cir.), *cert. denied,* 422 U.S. 1044, 95 S.Ct. 2645, 45 L.Ed.2d 696 (1975).

Finding no merit in the appeal, I would affirm.