**UNITED STATES of America, Appellee,**

**v.**

**Robert L. Van MEERBEKE and Donald M. Jones, Appellants.**

**Nos. 635, 636, Dockets 76–1278, 76–1327.**

United States Court of Appeals, Second Circuit.

Argued Dec. 9, 1976.

Decided Dec. 27, 1976.

Certiorari Denied April 18, 1977.

See 97 S.Ct. 1663.

---

Guy L. Heinemann, New York City, for appellant Van Meerbeke.

Barry A. Bohrer, New York City (Ivan S. Fisher, New York City, on the brief), for appellant Jones.

Douglas J. Kramer, Asst. U. S. Atty., Brooklyn, N. Y. (David G. Trager, U. S. Atty., Eastern District of New York, Brooklyn, N. Y., on the brief, Alvin A. Schall, Asst. U. S. Atty., Brooklyn, N. Y., of counsel), for appellee.

Before KAUFMAN, Chief Judge, OAKES and GURFEIN, Circuit Judges.

IRVING R. KAUFMAN, Chief Judge:

A courtroom is not always a haven from the more bizarre manifestations of human behavior. In this case, we are asked to decide whether the ingestion of opium by a government witness during his testimony requires reversal of the appellants' convictions for importing approximately ten pounds of opium into the United States, 21 U.S.C. § 952(a), 18 U.S.C. § 2, and conspiracy to commit that offense, 21 U.S.C. § 963.[1] Although we believe the better

---

1. Van Meerbeke was sentenced to five years imprisonment and a seven year special parole term. Jones received a two year sentence and a five year special parole term.

practice would have been for the trial judge to call a prompt halt to the witness's testimony when he observed the incident and to discuss it with counsel out of the presence of the jury, for the reasons hereinafter set forth, the judgments of conviction should be affirmed.

## I. THE CRIME

The Government's principal witness was Reuben Fife, a co-conspirator and an important participant in the illegal scheme. Fife testified that he met appellant Robert L. Van Meerbeke in San Francisco's Haight-Asbury district in 1968. In subsequent years, the two met frequently to use and discuss narcotics. On occasion they purchased drugs from each other.

In early 1975, these discussions crystallized into an ingeniously conceived scheme to smuggle opium into the United States. Fife, financed by Van Meerbeke, was to fly to India and purchase the narcotic. After secreting the opium in the false bottom of his suitcase, he was to proceed to London and meet the third conspirator, appellant Donald M. Jones, an acquaintance of Van Meerbeke's. Jones and Fife planned to exchange identical suitcases. Jones, dressed as conservatively as possible, would then attempt to carry the opium laden suitcase through United States customs. If apprehended, he would pretend that he had inadvertently retrieved the wrong suitcase.

These well laid plans went awry, however, when British Customs officials noticed Jones's suspicious behavior as he lurked in the air terminal awaiting Fife's arrival. To the surprise of the culprits, the British proceeded to inspect Jones's and Fife's valises. They were arrested on their arrival at Kennedy airport after information concerning the search was forwarded by the British. Jones was subsequently released, but Fife eventually pleaded guilty to drug charges and agreed to cooperate with the government in the prosecutions of Jones and Van Meerbeke.

## II. THE OPIUM INGESTING INCIDENTS

Fife was called to testify on March 25, 1976. In the course of describing his exploits, he identified the suitcase that had contained the opium, which was then introduced into evidence. Fife pointed out that small pieces of opium remained in the suitcase mixed with bits of fiberglass. At some point during his testimony on March 25, Fife removed a small chip of opium from the suitcase and swallowed it. Though his action was not perceived by either prosecution or defense counsel, it was observed by the trial judge, Judge Bramwell, and possibly by some jurors as well. Judge Bramwell did not comment on Fife's behavior or take any other action in response to this untoward incident.

When trial resumed on March 29, Fife continued his testimony. Apparently, bits of opium had fallen to the floor from the suitcase and remained in the witness box. Following a recess, a defense counsel observed Fife pick up a small piece of opium from the floor and place it in his mouth. The attorney did not immediately object, but questioned Fife about the incident during cross-examination. Fife admitted he had ingested small amounts of opium both that day and on March 25. The defendants immediately moved for a mistrial, or to strike Fife's testimony. Judge Bramwell denied both motions, and in so doing, revealed for the first time his own observations of Fife's behavior on March 25. He stated:

There was nothing—This is a person who used a lot of drugs. It is true when the suitcase was in front of him he took a small snip, the Court saw him and the jury saw him. I didn't see him take any today.

Judge Bramwell stated that Fife's credibility was a question for the jury, and allowed a free-wheeling and uninhibited cross-examination concerning Fife's drug use both on and off the witness stand. Following the jury's guilty verdict, Jones and

Van Meerbeke moved for a new trial, contending for the first time that a hearing should have been held to determine if the jurors had been prejudiced by the incident. The motion was denied.

## III. THE BREACH OF COURTROOM DECORUM

Van Meerbeke and Jones contend that Judge Bramwell's inaction during the first opium ingesting incident constituted reversible error. They argue that his silence implied condonation of Fife's breach of courtroom decorum. They analogize his action to a private communication with the jury, and argue that prejudice to the defendants should be presumed, even if it is clear from the dynamics of the entire trial that they were not harmed. *See Remmer v. United States,* 347 U.S. 227, 229, 74 S.Ct. 450, 98 L.Ed. 654 (1954); *United States v. Pfingst,* 477 F.2d 177, 198 (2d Cir.), *cert. denied* 412 U.S. 941, 93 S.Ct. 2779, 37 L.Ed.2d 400 (1973).

■ The trial judge's silence on March 25, in the face of such behavior was surely a serious abdication of his responsibility to maintain order and to control the proceedings. It would have been wiser to allow a question or two to pass and, without making much ado in the presence of the jury, to declare a recess, advise counsel of the incident, and thus enable them to have an informed discussion on the proper course to follow.[2] Several courses were available, if sought: suspension of testimony for the day, a medical examination to determine

the witness's capacity to continue with his testimony, and a stern warning to the witness outside the jury's hearing, that such behavior would not be tolerated.

Having said that, however, we cannot ignore a jury verdict grounded in compelling evidence that these defendants were guilty of serious narcotics offenses. The ends of justice are not served by lightly disregarding the Government's substantial evidence, particularly where we are convinced that the error did not affect the judgment. Moreover, the strategy employed by the defense indicates that rather than being harmed by the event, counsel turned it to their advantage by astute and blistering cross-examination. Under such circumstances, reversal would seem to be a reward for adroit gamesmanship.

■ But, Van Meerbeke and Jones assert that there exists the "possibility" that the jurors might have been "incensed" by Fife's graphic demonstration of his addiction. This, however, was not the result of Judge Bramwell's failure to advise counsel promptly on March 25. Such a "possibility" would remain throughout the trial unless the judge did nothing short of declaring a mistrial on the first occasion. Judge Bramwell was confronted with a motion for a mistrial after the second ingestion of opium on March 29, on the ground that Fife was "incompetent". He properly decided to leave the determination of Fife's credibility to the jury and counsel—except for afterthought—were satisfied with this.[3] They did not raise the issue of possible juror

---

**2.** A similar procedure was recently proposed by this Court for dealing with private communications between a judge and a juror, *see United States v. Robinson,* 544 F.2d 611, 621 (1976).

**3.** The questions raised by the motion for a mistrial (not to be confused with the motion for a new trial after the conclusion of the proceeding) are logically distinct from the problem presented when the trial judge first saw Fife ingest the opium. At the time of the March 29 motion, Fife had completed his testimony on direct and cross-examination. Van Meerbeke and Jones argued that Fife's testimony while under the influence of drugs had rendered him incompetent. Judge Bramwell properly found that it had not. Under Rule 601 of the Federal

Rules of Evidence, "Every person is competent to be a witness except as otherwise provided in these rules." The Advisory Committee report to Rule 601 notes that "The question is one particularly suited to the jury as one of weight and credibility".

Judge Bramwell noted at the side bar that Fife had been coherent, and that the jury could understand him. Under such circumstances, it was not erroneous to leave the determination of his credibility to the jury. "The competency of a witness to testify before a jury is a threshold question of law which lies exclusively in the trial court's discretion." *United States v. Gerry,* 515 F.2d 130 (2d Cir.), *cert. denied* 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975).

prejudice until after the verdict was returned. Moreover, the record is clear that Fife's addiction was a *constant* and open theme throughout the trial, and was skillfully used by the defense to impeach his credibility. For example:

> *3500 Statements.* The defense was aware, prior to the commencement of trial, that Fife had used drugs very extensively. Statements by Fife, provided by the government to the defense under 18 U.S.C. § 3500, admitted his drug abuse, and gave Van Meerbeke and Jones a powerful weapon with which to cross-examine and impeach his credibility. They did not stint in using it.

> *Cross-Examination.* Fife's drug abuse was vividly illustrated on cross-examination. It was revealed to the jury that Fife had taken LSD "somewhere around 300 times", and during his pretrial detention, he carried with him a small quantity of opium, secreted in his intestinal tract. After eliciting these lurid confessions, the defense went on to obtain Fife's admission he had ingested opium on the witness stand, both on March 25 and March 29. The jury, of course, heard all of this.

> *Direct Examination.* After their motion for a mistrial was denied, Jones and Van Meerbeke called Fife as a defense witness. Again, he was extensively questioned on his drug abuse, and particularly the opium eating incidents while on the stand. When asked what effect the first ingestion of opium had on him, he responded, "Minor hallucinations, the kind that happen to me sometimes when I don't take drugs".

> *Summation.* In the summations, Fife's egregious record of drug abuse was prominently noted, and his ingestion of opium on the witness stand put forward as indicative of the unreliability of his testimony. Fife was described as a "fanatic", "a drug addict", "his mind ravaged by drugs". The defense charged "he didn't have the guts to lie without the crutch of opium."

> *Charge to the jury.* The defense received a favorable charge from Judge Bramwell, who instructed the jury it could take into consideration Fife's ingestion of opium in evaluating his ability to observe those events he claimed to observe.

> *Motion for a New Trial.* It was only after the jury had returned a guilty verdict against Jones and Van Meerbeke on both counts, that defendants, in their motion for a new trial, suggested for the first time that a hearing should have been held to determine if any jurors were prejudiced by the trial judge's action (or lack of action) on the first day of Fife's testimony. Obviously, counsel's trial strategy was to use the incident to impeach Fife before the jury in the hope of obtaining an acquittal. Failing in that attempt, they sought a new trial, belatedly alleging *possible* juror prejudice.

■ Thus, in the context of the entire trial, it is evident that the trial judge's lapse did not result in prejudice to the defendants, nor did it affect the ultimate judgment. Fife's ingestion of opium on both March 25 and March 29 were fully explained and argued to the jury. It is not without significance that on the second occasion, when Fife's behavior became known to defense counsel, no request was made for a hearing, a recess, or a doctor's examination. Rather, counsel made a conscious and perhaps sound strategy decision to use both the March 25 and 29 incidents to bolster their case. Although we have indicated our belief that the trial judge's inaction on March 25 was ill-advised, we cannot ignore that Van Meerbeke and Jones, far from being injured by the incident, aggressively turned it to their advantage.

■ In sum, we believe the trial was fair and the incidents under contention did not

---

To say that a witness's credibility is properly left to the jury, however, is not to imply that a judge must in all circumstances tolerate testimony by a witness under the influence of drugs.

adversely affect the finding of guilt. Accordingly, the judgment is affirmed.[4]

OAKES, Circuit Judge (concurring):

Chief Judge Kaufman's opinion concludes that the trial judge's silence on March 25, while "a serious abdication of his responsibility" amounting to "error," did not affect the judgment. I agree with this conclusion and therefore concur in the opinion, but write separately only to emphasize the significance of the type of error committed here. As the panel opinion implies, it is the type of error on which, in another case, we might be forced to reverse despite strong evidence of guilt, if we could not say that the error did not affect the judgment. *See United States v. Robinson,* 544 F.2d 611, 619 (2d Cir. 1976), *quoting* R. Traynor, *The Riddle of Harmless Error* 28 (1970).

I simply do not understand how a trial judge who sees a witness taking a drug can allow the trial to continue as if nothing had happened. It may be that the ingestion by a drug addict of a "small snip" of raw opium would have no effect on the addict's capacity as a witness, but that is hardly a question on which federal judges are qualified to take *sub silentio* judicial notice. *See McCormick's Handbook of the Law of Evidence* § 329, at 760 (2d ed. E. Clearly 1972). As Judge Kaufman's opinion makes clear, there were a number of options available to the judge had he excused the jury and revealed the bizarre opium-eating incident to counsel. The trial judge's own observations of the witness after the incident are hardly a substitute for "the benefits which informed discussion and debate between court and counsel may produce even where a court may be aware in the abstract of its own alternatives." *United States v. Robinson, supra,* 544 F.2d 611, 621.

When a trial judge sees a witness do something so unusual and is aware that counsel did not see the incident, he has an obligation to inform counsel as soon as possible as to what he has observed. To fail to do so is, in effect, to exclude the defendant from one of the trial's events, in violation of the defendant's right to be present "at every stage of the trial." Fed.R.Crim.P. 43(a). As we have previously noted, this right is an "unequivocal mandate," *United States v. Glick,* 463 F.2d 491, 493 (2d Cir. 1972), although subject, of course, to the harmless error rule, *see Rogers v. United States,* 422 U.S. 35, 40, 95 S.Ct. 2091, 45 L.Ed.2d 1 (1975); *United States v. Glick, supra,* 463 F.2d at 493; *United States v. Schor,* 418 F.2d 26, 30 (2d Cir. 1969). The Government, too, has a substantial interest in the matter.

The courts have repeatedly expressed condemnation of situations in which a trial judge receives a communication and fails to reveal it to counsel. *See, e. g., Rogers v. United States, supra,* 422 U.S. at 39–41, 95 S.Ct. 2091; *United States v. Robinson, supra,* at 620–621; *United States v. Glick, supra,* 463 F.2d at 493–94; *United States v. Schor, supra,* 418 F.2d at 29–30. In such situations, there is a "presumption of prejudice." *United States v. Treatman,* 524 F.2d 320, 323 (8th Cir. 1975). These situations seem to me virtually indistinguishable from the case before us. The trial judge's failure to disclose what he knows, be it a juror's communication or a witness's bizarre action, cannot be lightly passed over.

---

4. Van Meerbeke and Jones also contend that certain remarks of the trial judge bolstered Fife's credibility. But our careful examination of the record indicates that defense counsel had elicited these remarks by charging that Fife had "lied to the judge" in asking for a reduction in his sentence. Judge Bramwell, in responding to such charges, was not attempting to enhance the witness's credibility, but to extricate himself from defendant's implication that he had additional knowledge about the case. Unlike the actions of the trial judge in *United States v. Nazzaro,* 472 F.2d 302 (2 Cir. 1973), Judge Bramwell's comments did not indicate partisanship, nor belief in the guilt of the defendants. Moreover, his charge was fair and contained instructions that the jury was to disregard any comments he may have made during trial in making its own determination based on the evidence.