UNITED STATES of America, Appellee,

v.

Cecil ROBINSON, Appellant.

No. 1184, Docket 76–1153.
En Banc.

United States Court of Appeals,
Second Circuit.

Submitted March 17, 1977.
Decided July 28, 1977.

Jesse Berman, New York City, for appellant.

Robert J. Jossen, Asst. U. S. Atty., New York City (Robert B. Fiske, Jr., U. S. Atty.,

S.D.N.Y., Audrey Strauss, Frederick T. Davis, Asst. U. S. Attys., New York City, of counsel), for appellee.

Before KAUFMAN, Chief Judge, and FEINBERG, MANSFIELD, MULLIGAN, OAKES, TIMBERS, GURFEIN, VAN GRAAFEILAND and MESKILL, Circuit Judges.

MANSFIELD, Circuit Judge:

Following a decision by a panel of this court reversing appellant's conviction of bank robbery, see 544 F.2d 611, we granted rehearing of this appeal *en banc* in order to consider the recurring questions of when evidence of a defendant's possession of a weapon at the time of arrest may properly be admitted under Rule 403 of the Federal Rules of Evidence ("FRE")[1] and what standard of review is to be applied in reviewing the trial court's exercise of discretion in balancing the probative value of such evidence against its prejudicial effect. We vacate the panel judgment and decision, and hold that upon a charge of armed robbery evidence of the defendant's possession at the time of arrest of a weapon similar to that shown by independent proof to have been possessed by him at the time of his participation in the alleged crime may be introduced and that the district court's admission of the evidence should not be disturbed for abuse of discretion in the absence of a showing that the trial judge acted arbitrarily or irrationally. Under this standard the conviction here must be affirmed.

After trial before a jury and Judge Frederick vanPelt Bryan of the United States District Court for the Southern District of New York, appellant Cecil Robinson was convicted of bank robbery in violation of 18 U.S.C. § 2113(a)[2] and sentenced to 12 years

---

1. Rule 403 provides that "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

2. The indictment also charged Robinson and a fugitive co-defendant, Edward Garris, with conspiracy to commit bank robbery, 18 U.S.C. § 371, and armed bank robbery, 18 U.S.C. § 2113(d). Upon Robinson's conviction of bank robbery, 18 U.S.C. § 2113(a),

imprisonment. An earlier trial before Judge Kevin T. Duffy had resulted in a jury hung 8 to 4 for conviction and the declaration of a mistrial.

Robinson was charged with being one of four men (the other three were Allen Simon, Edward Garris, and a person named "Karim") who robbed the Bankers Trust Company branch at 177 East Broadway, New York City, of $10,122 on the morning of May 16, 1975. He was arrested on July 25, 1975, 10 weeks later, after Allen Simon, who had been arrested and charged with participation in the crime, confessed and identified Robinson as one of his co-participants.[3] At the time of his arrest Robinson had in his possession a .38 caliber revolver.

Upon the trial before Judge Bryan the principal witness against Robinson was Simon, who admitted participating in the May 16 robbery and who had on August 19, 1975, pleaded guilty to bank robbery and the use of a firearm, receiving an 18-year sentence. He agreed to testify against Robinson in return for government aid in gaining a reduction in his sentence, which was subsequently reduced to 10 years.

Simon testified that he and Robinson (known as "Merciful") along with Edward Garris (known as "A.E.") and a person named "Karim," planned and carried out the robbery. According to Simon, Robinson selected a Bankers Trust branch located two blocks away from the Gouverneur Hospital, where Robinson worked as a laboratory technician, as the bank to be robbed. Robinson also introduced "Karim," who was to drive the getaway car, to Garris and Simon, and suggested that he and "Karim" wear white jackets during the robbery in order to blend in with the hospital employees who frequented the bank. In addition, Robinson offered to obtain a getaway car. Simon also testified that on the night before the robbery the conspirators assembled four guns to be used in carrying out the crime: one shotgun, one .32 caliber hand gun, one .38 caliber revolver, and one revolver that "looked like it might have been a .38." The guns were hidden in a vacant apartment and picked up by the conspirators later that night for use in the robbery. During the robbery Simon used the shotgun and "Karim" used the .32 caliber revolver, which he accidentally discharged, wounding a teller. Immediately after the robbery, Robinson passed his gun to Garris in the back seat of the getaway car.

The government also introduced proof that Robinson's fingerprint had been found on the right rear cigarette panel of the red 1974 Pontiac used as the getaway car, which was abandoned 20 minutes after the robbery. The Pontiac's owner was identified as Otis Brown, a friend of Robinson and a fellow student at Bronx Community College, which Robinson attended on a part-time basis. Full-face bank surveillance photographs taken during the commission of the crime revealed a man wearing a hat and a white hospital-type jacket, who appears to have facial features quite similar to those of Robinson and to be scooping money into a paper bag. It was also established that Robinson had failed to appear for work as scheduled at the hospital on the day of the robbery. Two Human Resources Administration employees testified that Robinson was a long standing acquaintance of Garris, the fourth robber.

After the foregoing evidence (except for the testimony of the Human Resources Administration employees), including proof of the guns used in the robbery, had been introduced, Judge Bryan admitted testimony by FBI agents that, when arrested on July 25, 1975, Robinson had a .38 caliber revolver in his possession. The court refus-

these other charges against him were dismissed with the government's consent.

The indictment against Robinson and Garris superseded an earlier indictment (75 Cr. 635) which also named Allen Simon as one of the bank robbers. A fourth alleged participant in the robbery, one "Karim," has not been indicted.

3. The evidence at the trial showed that Simon named Robinson as one of the conspirators on the day of his arrest and again when he identified Robinson as a participant shown in bank surveillance photographs of the robbery.

ed to permit the gun itself to be put in evidence or shown to the jury, and carefully instructed the jury that this evidence was received solely on the issue of Robinson's identity as one of the robbers.[4] At the first trial Judge Duffy had excluded similar evidence but did not have before him the proof of the assembling and calibers of the guns used in the robbery (including the use of a .38 caliber and one that "looked like" a .38 caliber), which was introduced at the second trial.

The only evidence offered by Robinson in his defense was the testimony of several employees of the bank that the photospreads they were shown by the FBI prior to Simon's arrest did not include Robinson's photograph.

None of the bank witnesses was asked by the government or the defense whether they could identify Robinson as one of the robbers or as the robber wearing the white jacket and hat in the bank surveillance photos. However, those bank witnesses who

were called testified that they would not be able to identify the robber shown in the surveillance photos as wearing the hat and white jacket because they did not concentrate on him or get a good look since their attention was diverted by the shooting of one of the tellers and because they were concentrating on the robber who held the shotgun. The trial judge excluded the government's proffer of testimony by persons who had seen Robinson on numerous occasions to the effect that the robber shown in the bank surveillance photographs as wearing a hat was Robinson.

After hearing all the evidence and Judge Bryan's charge, the jury deliberated for about five hours,[5] after which in a note to the court it reported itself deadlocked "11–1 for conviction on Count Two [bank robbery]." After advising counsel of the note, but not of the precise division of the jury, Judge Bryan delivered a modified *Allen* charge,[6] see *Allen v. United States*, 164 U.S.

---

**4.** Judge Bryan's charge on the evidentiary value of the gun was as follows:

> "In certain instances evidence may be admitted for a particular, limited purpose only. Now, you have heard testimony about a .38 calibre hand gun which was found when the defendant was arrested on these charges, some two months after the robbery. That testimony was admitted for a very limited purpose. It may be considered only for whatever value, if any, it has on the issue of defendant's identity as one of the robbers, that is, on the question of whether this defendant was the person who committed the crimes charged. You may not draw any conclusions or inferences or engage in any speculation as to the defendant's character or reputation on the basis of this testimony or about anything else other than the narrow thing that I have just mentioned to you. You may consider this evidence solely for the limited purpose I have described and give it such weight, if any, for that purpose as you think it may deserve."

**5.** This was the estimate of defense counsel.

**6.** "The Court: Well, ladies and gentlemen, this case has been tried for quite a number of days before the Court here, and it is eminently desirable that you reach an agreement on a verdict in this case, if you possibly can.

> "The case is an important one for the parties. It involved a great amount of time and effort on the part of both the parties, the time

of the Court and the time of you citizens who are serving on the jury.

> "Now, if you fail to agree on a verdict, the case is going to have to be tried, I expect, before another jury, and I see no reason to suppose that another jury would be more competent to determine the issues here than you ladies and gentlemen are.

> "As I say, it is wholly desirable and it is your duty to reach a verdict here if you possibly can. Of course, by pointing out the desirability of your reaching a verdict here and your duty to do so if you possibly can, I am not suggesting that any of you should surrender a conscientious conviction as to where the truth lies here or as to the weight and effect of all the evidence.

> "However, while each of you must decide the question for himself or herself and not merely acquiesce in the conclusions of your fellow jurors, I think you ought to examine the issues here with candor and frankness and with proper deference and regard for the opinions of one another.

> "I will put it to you this way:

> "You should examine the questions submitted to you with candor—and I am repeating—and with a proper regard and deference for the opinions of each other. You should listen to each others' views with a disposition to be convinced.

> "Now, that does not mean that you should give up any conscientious views that you hold, but it is your duty, after full delibera-

492, 501–02, 17 S.Ct. 154, 41 L.Ed. 528 (1896). After three more hours, one juror in a note to the court sought advice on the ground that "regardless of honest efforts of my co-jurors to persuade me, I am unable to reach a decision without a strong reasonable doubt." After sealing the note, Judge Bryan informed counsel of its existence. Both sides agreed that jury deliberations should continue but, since it was after 6:30 P.M., the jury was sent home for the night.

At 10:00 A.M. the following morning, as part of his opening remarks, Judge Bryan delivered a short modified *Allen*-type charge, stating that

> "the only response that I can give to that note is to state again for you some of what I stated yesterday afternoon, that is, you should examine the questions submitted to you with candor and with a proper regard for and deference to the opinions of one another; you should listen to one anothers' views with a disposition to be convinced.
>
> "That does not mean that you should give up any conscientious views that you hold, but it is your duty after full deliberation, to agree upon a verdict, if you can do so without violating your individual judgment and your individual conscience."

At 2:45 P.M. the jury reached a verdict finding Robinson guilty of Count Two of the indictment. The government did not oppose dismissal of the other counts.

Appellant's principal contentions on appeal are that the district judge erred in admitting testimony concerning the gun

---

tion here, to agree, if you can do so, without violating your individual conscience and judgment.

"So I am going to ask you to go back—I know how tedious these things are, but I am going to ask you to go back at this thing and work at it again in the spirit and atmosphere that I have suggested to you. It is important that a decision, a verdict be reached here, and I really see no good reason why a decision cannot be reached, bearing in mind what I have said and my cautions to you.

"Please, now, go back and try once more."

7. FRE 401 defines "relevant evidence" as follows:

---

found in Robinson's possession at the time of the arrest and in sealing the juror's note and giving a second *Allen*-type charge.

## DISCUSSION

The principal issue at trial, as happens so often in bank robbery cases, was the identification of appellant as one of the bank robbers. As the panel majority conceded, see 544 F.2d at 615, the proof that upon arrest he had had a .38 caliber revolver in his possession was "relevant" to that issue, as the term is defined in FRE 401.[7] As evidence linking him to the crime, it tended to make his participation in the robbery "more probable . . . than it would be without the evidence," *id.* According to Simon, whose testimony must be accepted as credible for present purposes, Robinson, within minutes after the robbery and as the robbers were speeding away in the getaway car, handed over a gun to Garris, one of the robbers. Since four guns had been assembled by the four robbers for use in the robbery (a shotgun, a .32 caliber gun, a .38 caliber gun, and a gun that "looked like" a .38 caliber) and during the robbery Simon carried the shotgun while Garris held the .32 caliber gun, the gun in Robinson's possession was by the process of elimination either the .38 caliber or the gun that "looked like" a .38 caliber. The remarkable coincidence that he possessed a .38 caliber gun some weeks later thus tended directly to identify appellant as one of the participants, corroborating Simon's testimony.[8] As we said in *United States v. Ravich*, 421 F.2d 1196, 1204 (2d Cir. 1970):

> " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequences to the determination of the action more probable or less probable than it would be without the evidence."

8. Our dissenting colleague, Judge Oakes, repeatedly states, without any record or judicially noticeable support, that "hundreds of thousands of persons . . . possess the same caliber gun" as the .38 caliber hand gun used in the crime according to Simon's testimony and found on Robinson at the time of arrest, which is characterized by the dissent as 'undistinctive,' 'common' and 'unremarkable.' In a simi-

"Nevertheless, a jury could infer from the possession of a large number of guns at the date of arrest that at least some of them had been possessed for a substantial period of time, and therefore that the defendants had possessed guns on and before the date of the robbery. See *United States v. Consolidated Laundries Corp.,* 291 F.2d 563, 569 (2 Cir. 1961), and 2 Wigmore, Evidence § 437(1) (3d ed. 1940)."

See also *United States v. McKinley,* 158 U.S.App.D.C. 280, 485 F.2d 1059, 1060 (1973) (sawed-off shotgun similar to that used in crime); *United States v. Cunningham,* 423 F.2d 1269, 1276 (4th Cir. 1970) (similarity of weapons); *Walker v. United States,* 490 F.2d 683, 684 (8th Cir. 1974) (evidence of similar weapon "has been regularly admitted as relevant").

Regardless of the relevance of the evidence as corroborating Simon's testimony, Robinson's possession of the gun was also admissible under FRE 404 [9] on the independent ground that it tended to show he had the "opportunity" to commit the bank robbery, since he had access to an instrument similar to that used to commit it. This ground was recognized by us in *United States v. Ravich,* 421 F.2d 1196 (2d Cir.), *cert. denied,* 400 U.S. 834, 91 S.Ct. 69, 27 L.Ed.2d 66 (1970), where we upheld the admission of the defendant's possession upon arrest of guns and ammunition other than those used in the alleged bank robbery.

"Direct evidence of such possession would have been relevant to establish opportunity or preparation to commit the crime charged and thus would have tended to prove the identity of the robbers, the only real issue in this trial." 421 F.2d at 1204. See also *United States v. Wiener,* 534 F.2d 15 (2d Cir. 1976), *cert. denied,* 429 U.S. 820, 97 S.Ct. 66, 50 L.Ed.2d 80 (1976) (loaded gun found with narcotics in burlap bag in apartment of defendant charged with narcotics law violations admitted "as tools of the trade"); *United States v. Campanile,* 516 F.2d 288 (2d Cir. 1975) (admission of Luger handgun seized upon search upheld); *United States v. Walters,* 477 F.2d 386, 388-89 (9th Cir.), *cert. denied,* 414 U.S. 1007, 94 S.Ct. 368, 38 L.Ed.2d 245 (1973); *United States v. McKinley,* 158 U.S.App.D.C. 280, 485 F.2d 1059 (1973); *Walker v. United States,* 490 F.2d 683 (8th Cir. 1974).

The proof of Robinson's possession of the .38 caliber gun at the time of arrest, while relevant on two separate grounds, also posed the "danger of unfair prejudice" within the meaning of FRE 403, which provides that "[A]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." The Advisory Committee Notes define "unfair prejudice" as "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Evidence that a defendant had a gun in his possession at the time of arrest could in some circumstances lead a juror to conclude that the defendant should be punished for possession

---

lar vein Judge Oakes states that we do not dispute his earlier panel majority opinion characterizing the .38 caliber gun evidence as 'very weak' for the purpose of establishing appellant's identity.

Our views on these matters are best summarized by reiterating with approval the following statement from the earlier panel dissent:

"While hand guns may be all too plentiful in our society, the majority would imply that they are as common as subway tokens. In fact, the vast majority of people do not possess a hand gun, much less one of .38 caliber. To find such a gun in the possession of the very person against whom there is independent proof that he used a .38 caliber hand gun in the bank robbery is sufficiently coinci-

dental to be extraordinary. I cannot agree with the majority that this evidence 'established only a very weak inference that appellant was one of the bank robbers.' " *United States v. Robinson,* 544 F.2d 611, 622 (2d Cir. 1976).

9. FRE 404(b) provides in pertinent part:

"(b) . . . Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, *opportunity,* intent, preparation, plan, knowledge, identity, or absence of mistake or accident." (Emphasis added).

of the gun rather than because he was guilty of the substantive offense, 1 Wigmore on Evidence § 57 (3d ed. 1940). Absent counterbalancing probative value, evidence having a strong emotional or inflammatory impact, such as a "bloody shirt" or "dying accusation of poisoning," see *United States v. Leonard,* 524 F.2d 1076, 1091 (2d Cir. 1975), *cert. denied,* 425 U.S. 958, 96 S.Ct. 1737, 48 L.Ed.2d 202 (1976), may pose a risk of unfair prejudice because it "tends to distract" the jury from the issues in the case and "permits the trier of fact to reward the good man and to punish the bad man because of their respective characters despite what the evidence in the case shows actually happened." Advisory Committee Notes, FRE 404, quoting with approval the California Law Revision Commission. The effect in such a case might be to arouse the jury's passions to a point where they would act irrationally in reaching a verdict.

■ The duty of weighing the probative value of the gun-at-arrest evidence against its prejudicial effect rested squarely on the shoulders of the experienced trial judge. To determine whether he committed error requiring reversal by admitting proof of appellant's possession of the .38 caliber gun upon arrest, we must first consider what standard of review should be applied. We have repeatedly recognized that the trial judge's discretion in performing this balancing function is wide. See, e.g., *United States v. Ravich, supra,* where we upheld the admission of six guns seized from the defendants at the time of arrest, stating:

"The trial judge must weigh the probative value of the evidence against its tendency to create unfair prejudice and his determination will rarely be disturbed on appeal. *Cotton v. United States,* 361 F.2d 673, 676 (8 Cir. 1966); *Wangrow v. United States,* 399 F.2d 106, 115 (8 Cir.), cert. denied, 393 U.S. 933, 89 S.Ct. 292, 21 L.Ed.2d 270 (1968).

\* \* \* \* \* \*

"Notwithstanding the relevance of the guns and the ammunition, the trial judge would have been justified in excluding them if he decided that their probative value was outweighed by their tendency to confuse the issues or inflame the jury. He might well have done so in this case, in view of the overwhelming evidence that the defendants were the robbers, the rather small addition which the guns provided, and the undoubted effect on the jury of seeing all this hardware on the table. However, the trial judge has wide discretion in this area, see *United States v. Montalvo, supra,* 2 Cir., 271 F.2d 922, at 927, and we do not find that it was abused here." 421 F.2d at 1204–05.

See in accord *United States v. Dwyer,* 539 F.2d 924 (2d Cir. 1976); *United States v. Leonard, supra; United States v. Cheung Kin Ping,* 555 F.2d 1069 (2d Cir. 1977).

Broad discretion must be accorded to the trial judge in such matters for the reason that he is in a superior position to evaluate the impact of the evidence, since he sees the witnesses, defendant, jurors, and counsel, and their mannerisms and reactions. See *United States v. Leonard, supra,* 524 F.2d at 1094. He is therefore able, on the basis of personal observation, to evaluate the impressions made by witnesses, whereas we must deal with the cold record. For instance, on the vital issue of identification of the defendant, Judge Bryan, based on his own personal observation of the accused and comparison with bank surveillance photos, could form a clearer impression than that which we might gain from only a comparison of photographs. Though we may strive most diligently and with all of our accumulated experience to obtain from the black and white of transcripts before us a perspective equivalent to that of the experienced and able district court judge who tried this case, unless complete videotaped trial records become available, see *United States v. Weiss,* 491 F.2d 460, n.2 (2d Cir.), *cert. denied,* 419 U.S. 833, 95 S.Ct. 58, 42 L.Ed.2d 59 (1974), we simply cannot successfully put ourselves in his position. Specifically, we cannot weigh on appeal, as he could at trial, the intonation and demeanor of the witnesses preceding the testimony in issue, particularly the strength of Simon's testimony, nor can we determine the emo-

tional reaction of the jury to other pieces of evidence such as the surveillance photographs, or judge the success of impeachment by cross-examination through observation of the jurors. As Professor Maurice Rosenberg has cogently observed:

"The final reason—and probably the most pointed and helpful one—for bestowing discretion on the trial judge as to many matters is, paradoxically, the superiority of his nether position. It is not that he knows more than his loftier brothers; rather he sees more and senses more. In the dialogue between the appellate judges and the trial judge, the former often seem to be saying: 'You were there. We do not think we would have done what you did, but we were not present and may be unaware of significant matters, for the record does not adequately convey to us all that went on at the trial.' " Rosenberg, *Judicial Discretion Viewed From Above,* 22 Syracuse L.Rev. 635, 663 (1971).

For these reasons we are persuaded that the preferable rule is to uphold the trial judge's exercise of discretion unless he acts arbitrarily or irrationally. See *United States v. McWilliams,* 82 U.S.App.D.C. 259, 163 F.2d 695, 697 (1947). We thus adhere to the traditional formulation of the abuse of discretion standard, which is based on the premise that "the Court of Appeals should not and will not substitute its judgment for that of the trial court," *Atchison, Topeka and Santa Fe Rwy. v. Barrett,* 246 F.2d 846, 849 (9th Cir. 1957).[10] In a different context Judge Waterman, in *Napolitano v. Compania Sud Americana De Vapores,* 421 F.2d 382, 384 (2d Cir. 1970), expressed the general philosophy of this broad grant of discretionary power as follows:

"Had any one of us been in a position to exercise the discretion committed to a trial judge . . . we would have no hesitancy in stating that the decision would have been otherwise; but as appellate judges we cannot find that the action of the district judge was so unreasonable and so arbitrary as to amount to a prejudicial abuse of the discretion necessary to repose in trial judges during the conduct of a trial."

Similar views were expressed by Judge Adams of the Third Circuit:

"The task of assessing potential prejudice is one for which the trial judge, considering his familiarity with the full array of evidence in a case, is particularly suited. . . . The practical problems inherent in this balancing of intangibles—of probative worth against the danger of prejudice or confusion—call for a generous measure of discretion in the trial judge. Were we sitting as a trial judge in this case, we might well have concluded that the potentially prejudicial nature of the evidence . . . outweighed its probative worth. However, we cannot say that the trial judge abused his discretion in reaching the contrary conclusion." *Construction Ltd. v. Brooks-Skinner Building Co.,* 488 F.2d 427, 431 (3d Cir. 1973).

Applying the arbitrary-irrational standard for abuse of discretion to the present case, Judge Bryan's ruling clearly must be upheld. He carefully considered arguments of counsel and weighed the competing interests before admitting the evidence of Robinson's possession of the .38 caliber gun upon arrest. In line with suggestions made by us in *United States v. Leonard, supra,* at 1092, he delayed its admission until virtually all of the other proof had been introduced, by which time he was in a better position to weigh the probative worth of the evidence against its prejudicial effect. Although there were competing considerations, it was neither unreasonable nor arbitrary to conclude that a sound basis existed for a probative inference to be drawn from the evidence which outweighed

---

**10.** *United States v. Ortiz,* No. 76–1460, 553 F.2d 782, 787–789 (2d Cir. 1977), which is repeatedly referred to by Judge Oakes in his dissent, involved the wholly unrelated issue of whether a witness' prior narcotics convictions have any probative value for impeachment purposes. Aside from its irrelevancy, we there upheld the trial judge's exercise of discretion in ruling that the convictions were admissible under Rule 609(a) of the Federal Rules of Evidence, which is consistent with the majority opinion here.

its prejudicial effect. He was, moreover, in a position to appraise Simon's testimony and the other incriminating evidence against Robinson, including his fingerprints in the getaway car, his similarity in appearance before the court to that of the white-jacketed robber wearing a hat shown in the surveillance photos, his absence from his job at the Gouverneur Hospital on the day of the robbery, and his prior acquaintanceship with Karim and Brown, the owner of the stolen car used for the getaway.[11] In addition, Judge Bryan took positive steps to minimize the potential impact of the evidence by precluding the government from introducing the gun itself or any ammunition [12] and by carefully instructing the jury that the testimony in question was introduced for a limited purpose only.[13] Under these circumstances Judge Bryan did not abuse his discretion in concluding that the balance weighed in favor of admitting the evidence.[14]

■ Appellant next contends that the court committed reversible error in sealing the contents of the note received from one juror on the second day of deliberations, advising the court that she had "a strong, reasonable doubt" and in giving a second *Allen*-type charge. The Sixth Amendment and Rule 43 of the Federal Rules of Criminal Procedure require that ordinarily a message from the jury be answered in open court and that counsel be given the opportunity to be heard before the trial judge responds to the jury's questions. *Rogers v. United States,* 422 U.S. 35, 39, 95 S.Ct. 2091, 45 L.Ed.2d 1 (1975). Here appellant does not claim a violation of his right to be present at every stage of the trial. However, he does contend that Judge Bryan should not have sealed the note, arguing that if its contents had been known his counsel would not have consented to the second *Allen*-type charge or might have proposed other charges.

■ Ordinarily the better procedure is for the trial judge to disclose the contents of a juror's note to the parties. However, the failure to do so here was hardly prejudi-

11. Appellant also argues that the case against him was close and that because of this "closeness" the evidence of his possession of the .38 caliber handgun upon arrest should have been excluded as too prejudicial since it may have tipped the scales against him. To the extent that appellant relied upon the 8 to 4 deadlock at the first trial, which led to a mistrial, the argument ignores the additional incriminating evidence adduced at the second trial (including the calibers of the guns used in committing the robbery and the proof of prior close acquaintanceship between Simon, Garris and Robinson). Moreover, appellant confuses the factors to be considered by the court in the weighing process, which are (1) the probative value of the proffered evidence, and (2) whether the evidence, either inherently or when considered with other proof, would so inflame the jury that it might act irrationally. Although it has often been suggested that where the other evidence of guilt is overwhelming the jury may have less need to consider evidence of a prejudicial nature, even though relevant, see, e.g., *United States v. Ravich, supra; United States v. Leonard, supra,* the "closeness" of the case is irrelevant to this weighing process.

12. In this respect the potential for prejudice fell far short of that presented in *United States v. Ravich, supra,* where a small arsenal of weaponry seized from the defendants upon arrest was introduced as real evidence and lay in full view of the jury on the courtroom table and was available for examination by it, or *United States v. Wiener, supra,* where the loaded gun found by police at the time of the defendant's arrest was displayed to the jury.

13. The Advisory Committee Notes to Rule 403 state that "in reaching a decision whether to exclude on the grounds of unfair prejudice, consideration should be given to the probable effectiveness or lack of effectiveness of a limiting instruction."

14. Nor do we find it necessary to determine whether Judge Bryan applied the correct standard in performing his weighing function. Two standards have been suggested. Judge Weinstein advocates that the "better approach" is to "give the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value." Weinstein's Evidence ¶ 403 [03] (1975). On the other hand, Professor Dolan, in *Rule 403: The Prejudice Rule in Evidence,* 49 So.Cal.L. Rev. 220, 233 (1976), suggests that courts should "resolve all doubts concerning the balance between probative value and prejudice in favor of prejudice." Judge Bryan's ruling would satisfy either standard.

cial error. Since the court was already aware that the jury stood 11–1 for conviction and no new questions of law were raised by the note, there was little or no need for Judge Bryan to consult with counsel concerning his response. Moreover, disclosure of the lone hold-out juror's name to counsel might, if this became known to her, embarrass her and have the contrary effect of leading her to yield rather than adhere to her views. In addition, appellant's counsel at no time sought to have the note unsealed. Nor did he suggest that Judge Bryan charge the jury in any other manner.

▆ The propriety of an *Allen*-type charge depends on whether it tends to coerce undecided jurors into reaching a verdict by abandoning without reason conscientiously held doubts. See *United States v. Green,* 523 F.2d 229, 236 (2d Cir. 1975). In *United States v. Hynes,* 424 F.2d 754, 757 (2d Cir.), *cert. denied,* 399 U.S. 933, 90 S.Ct. 2270, 26 L.Ed.2d 804 (1970), we held that proper *Allen*-type charges amount to

> "no more than a restatement of the precepts which the trial judge almost-invariably gives to guide the jurors' deliberations in his original charge. Its function is to emphasize that a verdict is in the best interests of both prosecution and defense, and we adhere to the view that '[t]he considerable costs in money and time to both sides if a retrial is necessary certainly justify an instruction to the jury that if it is possible for them to reach a unanimous verdict without any juror yielding a conscientious conviction . . . they should do so. *United States v. Rao,* 394 F.2d 354, 355 (2d Cir. 1968)."

As Judge Oakes stated in *United States v. Bermudez,* 526 F.2d 89, 100 (2d Cir. 1975), *cert. denied,* 425 U.S. 970, 96 S.Ct. 2166, 48 L.Ed.2d 793 (1976), such a charge is "permissible" when it provides "encouragement to the jurors to pursue their deliberations toward a verdict, if possible, in order to avoid the expense and delay of a new trial." No fixed period of time must necessarily elapse before the charge may properly be given. Moreover, the charge is "acceptable

not only when the jury has informed the judge that it cannot agree . . . but also when [as in the present case] the judge has learned that the jury was deadlocked 11 to 1 in favor of conviction. . . ." *United States v. Martinez,* 446 F.2d 118, 119–20 (2d Cir. 1971), *cert. denied,* 404 U.S. 944, 92 S.Ct. 297, 30 L.Ed.2d 259 (1971). As Judge Moore stated in *United States v. Meyers,* 410 F.2d 693, 697 (2d Cir.), where the jury also had advised the trial judge it was deadlocked 11 to 1:

> "The judge's warning that 'under no circumstances must any juror yield his conscientious judgment' makes the use of the *Allen* charge proper and not coercive, *United States v. Kenner,* 354 F.2d 780 (2d Cir. 1965), *cert. den.,* 383 U.S. 958, 86 S.Ct. 1223, 16 L.Ed.2d 301 (1966). The fact that the judge knew that there was a lone dissenter does not make the charge coercive inasmuch as the nature of the deadlock was disclosed to the Court voluntarily and without solicitation. See *Bowen v. United States,* 153 F.2d 747 (8th Cir. 1946). To hold otherwise would unnecessarily prohibit the use of the *Allen* charge . . . ."

See also *United States v. Jennings,* 471 F.2d 1310, 1313–14 (2d Cir.), *cert. denied,* 411 U.S. 935, 93 S.Ct. 1909, 36 L.Ed.2d 395 (1973) (where jury advised that it stood 11 to 1 for conviction).

Although the chances of coercion may increase with each successive appeal by the court to the jurors to try to reach a verdict we are unwilling to hold that a second *Allen*-type charge is error *per se.* Rather, we believe that an individualized determination of coercion is required. Applying that principle here, Judge Bryan's second charge was far short of being coercive. Its brevity and failure to mention any "need" to reach a verdict, while studiously emphasizing the "duty" to adhere to "individual judgment" and "individual conscience," reduced any potential for coercion to the point where the charge might even have been construed as encouraging the dissenter not to abandon her views. Finally, the fact that the jury deliberated for three hours

between the *Allen*-type charges and for more than four hours after the second such charge before reaching its verdict are strong indications that the effect of the charge was minimal. We therefore hold that the trial court did not abuse its discretion.[15]

■ Finally, we find no merit in appellant's claim that the government violated *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by failing to disclose that Simon, who testified he did not "know" Otis Brown, the owner of the getaway car, had once been introduced to him as "Hakim" by Robinson. Since this information was already known to Robinson, who introduced the two, disclosure was not required under *Brady, United States v. Stewart,* 513 F.2d 957, 960 (2d Cir. 1975), and cases cited therein. Second, the evidence was of minimal relevance or materiality on the issue of possible access to Brown's automobile since there was no evidence that Simon knew that Brown owned a car, much less the getaway car. See *Moore v. Illinois,* 408 U.S. 786, 794–97, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972). Finally, since the exact information under consideration here was read to the jury by stipulation of counsel during deliberations,[16] it tended in such a context to fully counteract the arguments that had been made by the government in summation.

The conviction is affirmed.

OAKES, Circuit Judge with whom Judge GURFEIN concurs (dissenting):

The panel majority opinion sets forth Judge Gurfein's and my views on the principal issues in this case. 544 F.2d 611 (2d Cir. 1976). I stated there that the case was "exceedingly close" on its facts. *Id.* at 616. Without evidence that Robinson was in possession of a gun at the time of his arrest (because the trial judge in the exercise of his discretion excluded it), there was a hung jury in the first trial. With such evidence (admitted by another trial judge in the exercise of his discretion), it still took a second *Allen* charge and further deliberation to move the second jury to vote for conviction. One is led to infer that the testimony as to possession of the gun made a crucial difference (despite limiting instructions). Since I believe that admission of the gun evidence constituted reversible error, I dissent.

As will be seen, this case turns to a large extent on its facts, which the en banc majority views differently from the panel majority. Because this case, insofar as it relates to the exercise of trial court discretion, must be resolved on its facts, and because, as would be expected, the en banc majority opinion establishes no new principles of law in the process, a disinterested observer might inquire as to purpose of en banc treatment. Obviously the court must either have a new, more liberal test for what is to be reheard en banc or a great deal of free time to engage in this type of exercise. *But see Gilliard v. Oswald,* 557 F.2d 359 (2d Cir. 1977) (denial of rehearing en banc in prisoners' rights case). Of course, I recognize that the court *does* make new—and I think bad—law in its disposition of the double *Allen* charge point, *see* Part IV *infra,* but that point was not the basis of the petition for rehearing en banc or its grant.

## I.

### *Review of Trial Court Discretion*

The en banc majority opinion cites many authorities, from this circuit and others, for the unexceptionable proposition that we should not substitute our judgment for that

---

**15.** Nor can we accept Judge Oakes' characterization of our opinion as not disputing his view that "the second charge was not necessary."

**16.** "There is one other matter I want to call to your attention.

"Counsel have stipulated that if Mr. Simon were recalled to the stand, he would testify that in late 1974 he was once introduced to Otis Brown by Robinson on the ground floor of Harlem Hospital. Simon was introduced as Arova, and the name 'Simon' was not mentioned. Edward Garris was present at that introduction but was not introduced.

"Simon would also testify that he saw Brown from a distance at Harlem Hospital on a subsequent occasion."

of the trial judge on matters within his discretion, particularly matters dependent on personal observation at trial. This proposition by repetition hardly takes on new meaning. If, the use of the words "arbitrary or irrational" is designed somehow to change this circuit's standard for review of trial court discretion, the majority opinion does not say so. The rule in this circuit, restated not long ago in the context of the provision here involved, Fed.R.Evid. 403, is that "great discretion in the trial judge . . . does not mean immunity from accountability." *United States v. Dwyer*, 539 F.2d 924, 928 (2d Cir. 1976). *See also Michelson v. United States*, 335 U.S. 469, 480, 69 S.Ct. 213, 93 L.Ed. 168 (1948) ("[w]ide discretion is accompanied by heavy responsibility on trial courts"); Rosenberg, *Judicial Discretion of the Trial Court, Viewed From Above*, 22 Syracuse L.Rev. 635, 665–66 (1971).

Recognizing this rule, we held under Fed. R.Evid. 403 that a trial judge's "wide discretion" in the "balancing of probative value against unfair prejudice" had been abused in a particular factual context, *United States v. Dwyer, supra*, 539 F.2d at 927–28, without making any claim that the trial judge had acted irrationally. Nor did the author of the en banc majority opinion make any such claim in his recent opinion arguing that a specific weighing of probative value and prejudice amounted to an abuse of discretion. *United States v. Ortiz*, No. 76–1460, 553 F.2d 782, 787–789 (2d Cir. 1977) (dissenting opinion). *See also Contemporary Mission Inc. v. Famous Music Corp.*, 557 F.2d 918, 928 (2d Cir. 1977); *Marx & Co. v. Diners' Club, Inc.*, 550 F.2d 505, 510–511 & nn. 18–19 (2d Cir. 1977). For the balance of this discussion I will assume that the standard established by these cases and others and not departed from in the majority opinion is the proper

one for reviewing the exercise of trial court discretion here.

## II.

### *Relevance, Probative Value and Prejudicial Impact*

Before the balancing process mandated by Fed.R.Evid. 403 can begin, the court must determine that the evidence in issue is "relevant," as that term is defined in Rule 401. The relevancy test of Rule 401 is an extremely modest one, so that the en banc majority's assertion of a "concession" of relevancy by the panel majority, *ante*, 560 F.2d at 512, provides no help at all in resolving this case. Since the bank robbers here carried guns, evidence of appellant's later possession of a gun does meet the rule's test of having "any tendency" to make appellant's participation in the robbery "more probable," but so would evidence of, *e. g.*, appellant's sex (assuming identification of the sex of the robbers), despite the fact that millions of others share that characteristic. Relevancy under Rule 401 is nothing more than a threshold test, a starting point in the determination of admissibility.[1]

Once evidence is deemed relevant, the trial court must then weigh carefully its probative value against the danger of unfair prejudice that evidence creates. The probative value of evidence cannot, of course, be assessed in a vacuum; the value must always be measured in terms of the purpose for which the evidence was introduced. *See* Dolan, *Rule 403: The Prejudice Rule in Evidence*, 49 S.Cal.L.Rev. 220, 233 (1976). In this case, as Judge Bryan's charge to the jury makes clear, *see ante*, 560 F.2d at 511 n. 4, the evidence was admitted "solely for the limited purpose" of establishing "defendant's identity as one of the robbers." The en banc majority offers two indirect ways in which the gun evi-

---

1.    Relevancy in the sense used in Fed.R.Evid. 401 was frequently called, in pre-Federal Rules days, "logical relevancy," which was then contrasted with "legal relevancy," a term referring to the balancing process now incorporated in Fed.R.Evid. 403. *See, e. g.*,

*Cotton v. United States*, 361 F.2d 673, 676 (8th Cir. 1966); *Hoag v. Wright*, 34 App.Div. 260, 266, 54 N.Y.S. 658, 662 (1898). *See generally McCormick's Handbook of the Law of Evidence* § 185 (2d ed. E. Cleary 1972).

dence might have helped to establish appellant's identity, neither of which was mentioned by the trial court. The majority contends that the evidence helped to corroborate Simon's testimony and that it was relevant to appellant's "opportunity" to commit the crime charged. Significantly, the majority does not discuss the degree of probative value of the gun evidence for either of these purposes, nor does it discuss whether the evidence provided any genuine direct proof of appellant's identity, pursuant to the trial court's charge.

The majority opinion first states that the gun evidence "tended directly to identify appellant as one of the participants, corroborating Simon's testimony." *Ante*, 560 F.2d at 512. The majority does not explain how corroboration of an accomplice's testimony can amount to "direct" identification of a defendant from his later possession of a gun. Such corroboration at best is an indirect form of identification, but even for this corroborative purpose the evidence here lacked probative value. Once Simon had decided to link appellant to the robbery,[2] it stands to reason that he would provide the authorities with supporting details that would help to implicate appellant in the crime. Thus the fact that appellant was found with a .38 caliber gun after Simon had said such a gun was prepared for use in the robbery may show nothing more than that Simon knew that appellant owned

a .38. To use the example referred to above, it is as if Simon had told the authorities that all the robbers were men. We would then not be surprised if Simon identified a man as a robber, but we would hardly argue that Simon's statement had been significantly corroborated merely because the one identified turned out to be a man.

The alternative purpose alleged in the majority opinion, that of showing that appellant had the "opportunity" to commit the robbery, *see* Fed.R.Evid. 404(b), is also indirectly linked to identity, *see United States v. Ravich*, 421 F.2d 1196, 1204 (2d Cir.), *cert. denied*, 400 U.S. 834, 91 S.Ct. 69, 27 L.Ed.2d 66 (1970), but the gun evidence is of virtually no probative significance in this regard. Neither the en banc majority nor the Government attempts to demonstrate that the gun evidence had any more probative value than that necessary to meet Rule 401's test of relevancy, discussed above. Appellant did possess, when arrested, a single .38 caliber gun, and that fact does show that "he had access to an instrument similar to that used to commit [the robbery]," *ante*, 560 F.2d at 513. But had any one of the hundreds of thousands of persons who possess the same caliber gun— no one contends that the gun here was other than undistinctive and unremarkable—been arrested for this crime, his possession of the gun would have been just as

---

2. Early in his interrogation by the Federal Bureau of Investigation (FBI), Simon was given reason to believe that the FBI wanted him to implicate appellant. FBI Agent McLaughlin showed Simon bank surveillance photographs of the robber with the white coat and hat and said, apparently in the first mention of appellant's name in this case, "That's Cecil Robinson." Simon at the time said, "No," but he later changed his mind after being asked if the robber in question was one Corley, a person whom Simon, according to his testimony, desired to protect because of his innocence. Later that day, however, Simon failed to implicate appellant in an interview with an Assistant United States Attorney.

Simon had strong motivation to testify about appellant in a manner that would ensure appellant's conviction. Simon had re-

ceived an 18-year sentence from Judge Duffy for his part in the bank robbery, and he had a motion to reduce sentence, pursuant to Fed. R.Crim.P. 35, pending before the judge at the time he testified. He stated at appellant's retrial his understanding that the Assistant United States Attorney prosecuting appellant would be telling Judge Duffy whether he (the prosecutor) was satisfied with Simon's testimony.

Finally, it should be noted that Simon was hardly the type of person who would have strong moral scruples against testifying falsely. In addition to his bank robbery conviction, he had earlier weapons and narcotics convictions, had violated the terms of bail and of conditional discharge, and had used and sold heroin. At the time of appellant's retrial, Simon had spent 12 of his 29 years in custody.

probative of his "opportunity" as was appellant's possession here.[3]

The possession of a single gun of a common type is manifestly different from the situation in a case like *United States v. Ravich, supra*, where a number of handguns were found together with a large amount of ammunition, *see* 421 F.2d at 1204. Such an arsenal is unusual enough to give its finding some probative value on the question of opportunity or preparation. Similarly, the gun found in *United States v. Wiener*, 534 F.2d 15 (2d Cir.), *cert. denied*, 429 U.S. 820, 97 S.Ct. 66, 50 L.Ed.2d 80 (1976), was seized from a distinctive burlap bag that also contained the narcotics and paraphernalia which were the principal items of evidence in the case, *see id.* at 17 & n. 3, 18. The gun in *United States v. Campanile*, 516 F.2d 288 (2d Cir. 1975), was the particular gun that the defendant himself admitted taking to the area of the robberies.[4] Such guns, found in unusual situations or closely linked to the crimes in question, have a degree of probative value that is entirely missing in this case, where the gun was undistinctive and no evidence linked it to the commission of the crime.[5] The gun here thus showed no more about appellant's "opportunity" to commit the crime than it would have shown about the opportunity of anyone else found in possession of such a gun.

In view of the thinness of the gun evidence from both "corroboration" and "opportunity" standpoints, it is perhaps not surprising that the trial judge's charge did not mention either of these purposes in connection with that evidence. One would think that, had the judge intended to allow the jury first to link the gun evidence to Simon's testimony or to appellant's "opportunity" and then to reason from there to appellant's identity as a robber, he would have instructed the jury accordingly, particularly in view of the relative complexity or sophistication of such analysis. Instead, Judge Bryan stated that the "only" purpose for the evidence's admission was for the light it shed on the question of identity. This statement, combined with the obvious weakness of the evidence in terms of other purposes, led the panel majority to focus on the evidence's probative value in directly establishing appellant's identity, something that the en banc majority opinion (as I read it) fails to do.

Since the panel majority's characterization of the evidence as "very weak" for this purpose, 544 F.2d at 616, is not disputed by the en banc majority, a short summary of the panel majority's reasoning should suffice here. We recognized in *United States v. Ravich, supra*, 421 F.2d at 1204 n. 10, that "[t]he length of the chain of inferences necessary to connect the evidence with the ultimate fact to be proved necessarily lessens the probative value of the evidence." Here the "chain of inferences" contained two tenuous links. First, from appellant's possession of a .38 ten weeks after the robbery, the jury would have had to infer that he possessed a .38 at the time of the robbery, when he might just as well have purchased the gun in the interval between the robbery and his arrest.[6] *See* 2 J. Wig-

---

**3.** It is of course true that certain other factors tended to link appellant to the crime, factors that would not have been present for other individuals who own .38 caliber guns. But these factors do not and cannot make the gun evidence more probative of appellant's opportunity, for then we would assume the conclusion in the minor premise; we would in effect be asserting that the gun evidence shows that appellant had the opportunity to commit the crime because other evidence shows that he did commit the crime.

**4.** The *Campanile* court, in admitting the gun evidence, noted that it "was on the borderline of admissibility in view of its tendency to create unfair prejudice." 516 F.2d at 292.

**5.** Simon did not testify that Robinson carried a gun in the bank; no other witness testified that the robber, whom *only* Simon identified as Robinson, carried a gun; the surveillance photographs showing the man Simon identified as Robinson do not show him carrying a gun.

**6.** The majority opinion, *ante*, 560 F.2d at 513, quotes *United States v. Ravich*, 421 F.2d 1196, 1204 (2d Cir.), *cert. denied*, 400 U.S. 834, 91 S.Ct. 69, 27 L.Ed.2d 66 (1970), for the proposition that the jury may draw such an inference of prior possession from the fact of later possession. In context, how-

more, *Evidence* § 410, at 384 (3d ed. 1940) ("this inference is always open to doubt"); *id.* § 437, at 413 ("the disturbing contingency is that some circumstance operating in the interval may have been the source of the subsequent existence"). Second, even assuming that appellant, along with thousands of other New Yorkers, possessed a .38 on the date of the robbery, and assuming that a .38 was actually used in the robbery, *see* 544 F.2d at 617 n. 8; note 5 *supra,* the jury would then have had somehow to infer that appellant's indistinctive .38 was the .38 used in the robbery. This inference was highly problematic on the facts of this case, since no evidence was introduced linking appellant's gun to the robbery or indicating that appellant carried a gun during the robbery, *see* note 5 *supra.* With two such difficult inferences to be overcome, "the probative value of the testimony that appellant possessed a .38 ten weeks after the robbery must be characterized as slight." 544 F.2d at 618.

I believe that this slight probative value "is substantially outweighed by the danger of unfair prejudice." Fed.R.Evid. 403. I need not dwell here on the likelihood of prejudice from admission of the gun evidence, since the en banc majority opinion essentially agrees with the analysis of the panel majority opinion, 544 F.2d at 618–19. The danger, as the en banc majority points out, *ante,* 560 F.2d at 514, is that such inflammatory evidence may distract the jury from the question of guilt or innocence of a specific crime, leading it to return a conviction not because the defendant committed a particular robbery, but rather in order to punish him for carrying a gun or for being an unsavory character. *See Contemporary Mission, Inc. v. Famous Music Corp., supra,* 557 F.2d at 930 (Van Graafei-

land, *J.,* concurring and dissenting) ("Evidence which may be arguably relevant should not be admitted if it tends . . . to mislead rather than enlighten the jury.").

The trial court's limiting instruction here was directed at dispelling this danger, but, in my view, was inadequate for this purpose. It mentioned the proper use of the gun evidence, the identification purpose, only once and did not mention any of the intermediate inferences necessary to connect the gun evidence to appellant's identity as a robber, *e. g.,* whether appellant had the gun at the date of the robbery. Moreover, as Judge Mansfield has recently noted, certain types of evidence are likely to be used "improperly" by a jury, "notwithstanding instructions." *United States v. Ortiz, supra,* 553 F.2d at 788 (dissenting opinion), *citing United States v. Puco,* 453 F.2d 539, 542 (2d Cir. 1971) ("The average jury is unable, despite curative instructions, to limit the influence of a defendant's criminal record to the issue of credibility."). Indeed, Rule 403 "by its terms concedes the possibility that the negative aspects of some evidence may simply be unmanageable for the factfinder regardless of instructions," for the rule would be wholly unnecessary if cautionary instructions could always dispel the possibility of unfair prejudice. Dolan, *supra,* 49 S.Cal.L.Rev. at 250. *See generally Bruton v. United States,* 391 U.S. 123, 129, 88 S.Ct. 1620, 1624, 20 L.Ed.2d 476 (1968), *quoting Krulewitch v. United States,* 336 U.S. 440, 453, 69 S.Ct. 716, 93 L.Ed. 790 (1949) (Jackson, *J.,* concurring) (" 'The naive assumption that prejudicial effects can be overcome by instructions to the jury . . . all practicing lawyers know to be unmitigated fiction.' "). Given the probable inefficacy of the cryptic limiting instruction here, the slight probative value of the gun

---

ever, this *Ravich* statement is plainly not meant to stand on its own, as an independent reason for admission of gun evidence, but rather is a necessary precondition to the *Ravich* holding that possession of guns prior to the robbery is evidence of opportunity to commit the crime charged. *See id.* The applicability of this latter aspect of *Ravich* to the instant case is discussed *supra.* In any event, it is certainly true that an inference of

prior possession *may* be drawn from the fact of later possession. The problem, implicitly acknowledged in *Ravich, see id.* (noting "rather small" probative value of gun evidence), is that the inference is quite weak, as discussed in text, and is here compounded by the necessity for making a second very weak inference before the evidence can be held to have any direct bearing on the identity question.

evidence, and the very real danger of unfair prejudice, I believe that admission of the gun evidence constituted error.

### III.

*Reversible Error: The Relevance of Other Evidence in the Case*

The en banc majority opinion displays a certain ambivalence on the question of how evidence other than the gun evidence is relevant to the Rule 403 assessment. On the one hand, it asserts that the fact that this was a close case before the jury is "irrelevant to [the ] weighing process." *Ante,* 560 F.2d at 516 n. 11. On the other, it seems preoccupied with showing that a strong case for conviction existed apart from the gun evidence, summarizing the other evidence against appellant in the same paragraph that it approves the Rule 403 balancing done by the trial judge. *Id.* at 516.

The majority cannot have it both ways. If indeed there were substantial other evidence against appellant, then the already slight probative value of the gun evidence is further diminished to the vanishing point, since the Government would have less need for this evidence in order to win its case. *See United States v. Ravich, supra,* 421 F.2d at 1204. But I believe that the other evidence against appellant was weak, a fact that, while making the gun evidence of somewhat more value to the Government, also makes it more likely that the trial court's error in admitting the gun evidence affected the judgment, *see* R. Traynor, *The Riddle of Harmless Error* 28 (1970).

The weakness of the Government's case becomes immediately apparent when the evidence summarized in the en banc majority opinion is placed in its proper context. The principal witness against appellant, Simon, had strong motivation to help the prosecution in order to reduce his own sentence, as the majority recognizes, *ante,* 560 F.2d at 510; the majority fails to note certain other ways in which Simon's credibility was diminished, summarized in note 2 *supra. Cf. United States v. Ortiz, supra,* 553 F.2d at 787–788 (Mansfield, *J.,* dissent-

ing) (noting "unsavory background" of crucial Government witness in context of weighing probative value and prejudice). As for other evidence, the majority mentions that appellant's fingerprint was found on the right rear cigarette lighter panel of Brown's car, but it fails to note that Simon had appellant riding in the left rear position going to the robbery and testified that appellant was not in the rear at all after the robbery. Hence the fingerprint evidence, which could not be dated, *see* 544 F.2d at 614, proves nothing more than that appellant had at some point ridden in Brown's car, a fact that is undisputed and unsurprising in view of Brown's testimony that he had given appellant, an acquaintance and fellow student, rides a half-dozen times prior to the robbery.

As for the use of "hospital-type jackets," from which the Government implies some sort of connection with appellant, who worked at a hospital, it is undisputed that the jackets, while white, were actually butchers' jackets and in fact had "meat market" written on them. The bank surveillance photographs of the robber alleged to be appellant were described by Simon as "hazy" and have provoked substantial uncertainty on this court, *see* 544 F.2d at 614. The robber in those photographs, as is noted above, note 5 *supra,* does not appear to be carrying any gun, whereas appellant allegedly carried the infamous .38, which he later "handed over" to Garris in the car, according to Simon and as emphasized by the majority, *ante,* 560 F.2d at 512. This latter fact is particularly surprising because it is inconsistent with appellant's possession of a .38 at the time of arrest. If he handed it over after the robbery, how did he get it back? Why, if it were his gun as Simon claimed, would he hand it over to someone else after the robbery? I note, as the majority does not, that none of the eight nonparticipant eyewitnesses to the crime identified appellant as one of the robbers. Only Simon did so.

In view of the infirmities in the Government's case, it is not surprising that a hung jury resulted at appellant's first trial,

524

where the jury was not exposed to the gun evidence, and that the jury at appellant's second trial nearly hung, requiring extensive deliberations over three days and two *Allen*-type charges before it could reach a verdict. While there were some minor differences between the evidence adduced at the two trials, there is little doubt that the introduction of the gun evidence was by far the most significant difference. Given the weakness of the Government's other evidence, the gun evidence had to have had an impact on the jury. There is simply no way to view its admission as harmless, and the majority does not argue otherwise. Concluding that the error in admitting the gun evidence affected the judgment, I would reverse.

## IV.

### The Juror's Note and the Two Allen Charges

Because the panel majority reversed on the Rule 403 ground, Judge Gurfein and I did not have to reach the questions whether the court below committed reversible error either in sealing the juror's note expressing her "strong reasonable doubt" or in giving two *Allen*-type charges after knowing of the jury's 11–1 split, with the second charge obviously directed at the particular woman who had written the judge of her doubt. The en banc majority concludes that neither issue provides ground for reversal.

The majority's conclusion as to the first issue is apparently based on the harmless error doctrine. The majority states that "the better procedure is for the trial judge to disclose the contents of a juror's note to the parties," but that "the failure to do so here was hardly prejudicial error." *Ante,* 560 F.2d at 516. This latter conclusion may be supported on the record before us,

but the seriousness of the trial court's failure to disclose the note's contents should be emphasized. This court recently held that a trial court's failure to disclose the substance of its communications with a juror constituted error, *United States v. Taylor,* 562 F.2d 1345, 1365 (2d Cir. 1977), noting that such private communications violate a defendant's right to be present at all stages of the proceedings, *id.* at 1365; *see* Fed.R. Crim.P. 43(a); *Illinois v. Allen,* 397 U.S. 337, 338, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970). In another recent opinion, this court stressed the importance of "an informed discussion [between court and counsel] on the proper course to follow," *United States v. Van Meerbeke,* 548 F.2d 415, 418 (2d Cir. 1976), *cert. denied,* 430 U.S. 974, 97 S.Ct. 1663, 52 L.Ed.2d 368 (1977), citing the *Robinson* panel opinion for this proposition, *id.* at 418 n. 2; *see* 544 F.2d at 621 ("benefits" of "informed discussion and debate between court and counsel . . . even where a court may be aware in the abstract of its own alternatives"). The trial court here should have revealed to counsel the substance of the juror's note, without disclosing the individual juror's name or the jury vote.[7] *See United States v. Dellinger,* 472 F.2d 340, 377–80 (7th Cir. 1972), *cert. denied,* 410 U.S. 970, 93 S.Ct. 1443, 35 L.Ed.2d 406 (1973).

With regard to the trial court's giving of two *Allen*-type charges after knowing of the jury's 11–1 split, the majority emphasizes parts of the court's second charge and ignores the overall potential for coercion. The charge did mention "individual judgment" and "individual conscience," but it also instructed the jurors—and in reality only the one juror whose note the court was explicitly answering by giving the second *Allen* charge—that they should have "a proper regard for and deference to the

7. The majority's reference to the problems that might arise were the juror's name to be disclosed, *ante,* 560 F.2d at 516–517, is puzzling. There simply was no reason for the name to be revealed; the note's contents could have been read to counsel by the court with the name at the bottom of the note withheld. The majority opinion also states that appellant's counsel did not seek to have the note

unsealed. *Id.* He did, however, make clear his belief that the sealing prejudiced his ability to act on behalf of his client. In response to the court's request for advice as to how to answer the note, appellant's counsel stated: "Without my knowing what is in her note, I can't comment too intelligently, except that I believe it is premature to give an *Allen* charge."

opinions of one another," that they "should listen to one another's views with a disposition to be convinced," and that they had a "duty . . . to agree upon a verdict" if they could do so. The charge here, in short, was quite similar to the charge of *Allen v. United States,* 164 U.S. 492, 501, 17 S.Ct. 154, 41 L.Ed. 528 (1896), a charge that, "[l]ike dynamite . . . should be used with great caution, and only when absolutely necessary," *United States v. Flannery,* 451 F.2d 880, 883 (1st Cir. 1971).

Here the second charge was not necessary and could not be otherwise than coercive. While the majority cites cases in which we have upheld the giving of one *Allen* charge after trial court notice of an 11–1 jury division, *ante,* 560 F.2d at 517, there is apparently no case, in this or any other circuit, upholding the giving of two *Allen* charges after the jury informs the judge of its 11–1 split. The fact that such a case has not arisen is itself indicative of a well-founded reluctance on the part of trial judges twice to tell a lone holdout to listen to other jurors' views "with a disposition to be convinced." When the judge so instructs the lone holdout, "the effect . . . is unavoidably to add the judge's influence to the side of the majority . . . ." with the sole minority juror "develop[ing] a sense of isolation and the impression that [he or she is] the special object of the judge's attention." *United States v. Sawyers,* 423 F.2d 1335, 1349 (4th Cir. 1970) (Sobeloff, *J.,* dissenting); *see United States v. Meyers,* 410 F.2d 693, 697 (2d Cir.) (Smith, *J.,* dissenting), *cert. denied,* 396 U.S. 835, 90 S.Ct. 93, 24 L.Ed.2d 86 (1969); *Mullin v. United States,* 123 U.S.App.D.C. 29, 356 F.2d 368, 370 (1966); Note, *The* Allen *Charge: Recurring Problems and Recent Developments,* 47 N.Y.U.L.Rev. 296, 306–08 (1972); Note, *Due Process, Judicial Economy and the Hung Jury: A Reexamination of the* Allen *Charge,* 53 Va.L.Rev. 123, 130–32 (1967).

Here the lone holdout quite obviously knew that she was "the special object of the judge's attention." Her note told the judge that she was the holdout, so that he knew to whom his remarks were addressed, and she knew that he knew. This aspect of our case, coupled with the giving of two Allen charges, differentiates it from the cases cited by the majority. Making "an individualized determination of coercion," as the majority opinion suggests, *ante,* 560 F.2d at 517, I cannot avoid the conclusion that there was impermissible coercion here.

## V.

I would reverse and remand for a new trial. In the light of two legal questions that by any stretch of the imagination have to be treated as close, a weak Government case, one hung jury, and one temporarily hung jury, a new trial for appellant seems to me to be just as desirable in the overall interests of justice, as it did at the time this case was heard, like any other, by a panel of this court.

GURFEIN, Circuit Judge (concurring in Judge OAKES' dissenting opinion):

I concur in Judge Oakes' strong dissenting opinion. I wish to add that I am sorry the court saw fit to take this case *en banc.* The only rule of law that has emerged is one that will be of little help in reviewing future rulings on evidence under Rule 403. Nobody disagrees that generally the ruling of the trial judge on his weighing of probative value against the substantial prejudice is entitled to great weight. But to say that he may not be reversed unless his decision is "arbitrary or irrational," in my view, simply detracts from meaningful review. For unless we can define what is "arbitrary" or "irrational," the use of such pejorative words simply tends to support an utter abdication of appellate review. I think that when we are weighing "prejudice" our duty as a first reviewing court should go somewhat further, for, as Judge Mansfield puts it, "the effect in such a case might be to arouse the jury's passions to a point where they would act irrationally in reaching a verdict." And I predict that occasions will arise when we will feel, as appellate judges, that prejudice has resulted and when we shall be compelled by our own verbiage to

say that a fine District Judge has been "arbitrary" or, indeed, "irrational," when all we can really mean is that in the particular case, "substantial prejudice" clearly outweighs "probative value."

As I believe Judge Oakes has demonstrated, this was a weak case in which the proof of identity rested almost entirely on the accomplice's testimony, given under hope of quite specific reward in the form of a reduced sentence and, perhaps, with some motive to shield another suspect who was a friend. The panel majority is inferentially taxed for not following *United States v. Ravich,* 421 F.2d 1196 (2d Cir. 1970), a decision which we have no difficulty accepting. There the evidence of guilt was overwhelming, and I would agree that the strong evidence of an arsenal of guns there admitted was, if erroneous, quite harmless. I do not believe that the same applies to a weak case, particularly one where the issue is identity. I do not agree that because evidence of slight probative force in terms of logical relevance exists, it ought to be admitted to supply a needed knockout blow.

On the contrary, it is in cases in which the prosecution case is weak where the weighing suggested in Rule 403 comes into sharp focus. In such cases, the "bad man" theory as a ground for conviction should be "outweighed" only if there is a heavier logical connection on the facts than where guilt is overwhelming. In sum, we cannot weigh prejudice except in a "tipping of the scale" context. This does not mean that evidence of strong probative value necessarily should be excluded because the case is otherwise weak. If its logically probative force is strong enough, the circumstance that the evidence will hurt the defendant is obviously not ground for exclusion. The difference of opinion here turns on whether there is sufficient probative force in the evidence, which it seems to me turns little in this case on what the judge saw in the courtroom, as against what we see in the record.

I have the greatest respect for the able trial judge in this case, but in my view, there is not a tight enough logical connec-

tion on the facts to outweigh the prejudice which all appear to concede can arise from this type of evidence.

FEINBERG, Circuit Judge, dissenting:

I would vacate the order for rehearing en banc as improvidently granted. Although the opinions of the en banc court are typically thorough and learned, the principal question they address is a simple and common one: Did the trial judge abuse his discretion in admitting evidence that the defendant possessed a gun when arrested? What, then, is the justification for the delay and burden of an en banc court? The majority opinion does not purport to announce a new rule governing the admission of evidence of weapons, since the majority says that it adheres "to the traditional formulation of the abuse of discretion standard . . . ." True, the majority opinion implies—although it nowhere flatly says so—that the original panel decision of Judges Oakes and Gurfein disregarded the teachings of such earlier cases as *United States v. Ravich,* 421 F.2d 1196 (2d Cir. 1970). But as Judge Oakes' en banc dissenting opinion demonstrates, the facts of *Ravich* were "manifestly different" from those present here. The original panel majority no more "overruled" *Ravich* than the en banc majority now "overrules" the warning in *United States v. Campanile,* 516 F.2d 288, 292 (2d Cir. 1975), that the stronger evidence there of gun possession "was on the borderline of admissibility in view of its tendency to create unfair prejudice."[1] Such questions of admissibility ordinarily depend upon the facts of the particular case and do not call for convening an en banc court, unless we regard that cumbersome procedure appropriate whenever a majority of the active judges disagree with the result reached by two of their brethren. Such a doctrine would wholly misconceive the purpose of the extraordinary en banc procedure. While the majority does not formally embrace that view, its action in compelling an en banc hearing in this routine case has that effect.

---

1. The majority opinion does not mention this statement.

Following our precedent in *United States v. Collins,* 462 F.2d 792, 801 (2d Cir.), cert. denied, 409 U.S. 988, 93 S.Ct. 343, 34 L.Ed.2d 254 (1972), I would simply vacate the petition for rehearing en banc as improvidently granted.[2]

---

**2.** *Cf. Rudolph v. United States,* 370 U.S. 269, 82 S.Ct. 1277, 8 L.Ed.2d 484 (1962); *Ferguson v. Moore-McCormack Lines,* 352 U.S. 521, 524–58, 77 S.Ct. 457, 1 L.Ed.2d 511 (1957) (Frankfurter, *J.,* dissenting); Stern & Gressman, Supreme Court Practice, § 5.15 at 227–30 (4th ed. 1969).

